# SUMMARY ISSUED BY THE WYOMING SUPREME COURT

January 6, 2026

*State v. Johnson*, No. S-24-0326, 2026 WY 1

*This summary is intended to help the public understand the main points of the decision. It does not modify, supplement, or change the content of the Court's opinion, or that of the specially concurring and dissenting opinions, and it should not be cited or relied on as legal precedent.*

## Case Background

In 2022, in *Dobbs v. Jackson Women's Health Organization*, the United States Supreme Court overruled *Roe v. Wade,* leaving authority to regulate abortion to the individual states.

In 2023, the Wyoming Legislature passed a law called the Life is a Human Right Act, which prohibits people from performing abortions in Wyoming, with certain exceptions. The Legislature also passed a law making it illegal "to prescribe, dispense, distribute, sell or use any drug for the purpose of procuring or performing an abortion on any person." That law also contains certain exceptions.

Immediately after these laws took effect, a group of medical professionals, two non-profit corporations, and an individual woman (the Plaintiffs) sued the State and those responsible for enforcing the laws. The Plaintiffs asked the courts to rule that both laws violate the Wyoming Constitution.

After reviewing evidence and hearing both sides' arguments, the trial court concluded the laws violate the Wyoming Constitution and told the State it cannot enforce them. The State appealed that decision to the Wyoming Supreme Court.

## Issue Before the Court

Because the Wyoming Supreme Court has the final say on what the Wyoming Constitution means, the Supreme Court did not rely on what the trial court decided. But like the trial court, the Supreme Court focused on a single issue:

**Do the Wyoming laws restricting abortions unjustifiably limit a woman's state constitutional right to make her own health care decisions?**

In 2012, Wyoming voters passed an amendment to the Wyoming Constitution that gave Wyoming adults the right to make their own health care decisions. That amendment, found at Article 1, Section 38 of the Wyoming Constitution, was intended to respond to the Affordable Care Act (a federal law often called Obamacare) and specifically says that: "Each competent adult shall have the right to make his or her own health care decisions."

## The Court's Decision

In deciding what that language means in this case, all five Wyoming Supreme Court justices agreed that the decision whether to terminate or continue a pregnancy is a woman's own health care decision protected by Article 1, Section 38. Relying on law from earlier Wyoming Supreme Court cases, all five justices also concluded that an adult's right to make his or her own healthcare decisions is a fundamental right because of the very specific language used and because that language was put in a section of the Wyoming Constitution called the "Declaration of Rights."

At this point, however, the justices took different paths in analyzing this case. Three justices concluded that the Court has an independent role in deciding what test applies to determine whether the 2023 laws violate the state constitution. Looking at prior cases and the language of Article 1, Section 38, the majority decided that a test called "strict scrutiny" applies in this case. Under that test, the State must prove the 2023 abortion laws were written as narrowly as possible to achieve the State's interest in protecting prenatal life— that the abortion laws were the least burdensome way the State could achieve that goal without unjustifiably restricting a woman's constitutional right to decide whether to terminate or continue a pregnancy. Only if the State met its burden of proof at the trial court level could the Supreme Court conclude the laws did not violate Article 1, Section 38.

The majority determined the State did not present enough evidence to show the restrictions (and exceptions) on performing abortions and the ban on medications (and exceptions) are no more restrictive than necessary to serve the State's interest in protecting prenatal life. Therefore, the majority held that those laws are unconstitutional.

Justice Fenn agreed with this result but arrived there by relying on a different test using only the words from Article 1, Section 38. In his specially concurring opinion, Justice Fenn concluded that the State failed to prove the 2023 laws were "reasonable and necessary restrictions" on the right to make one's own health care decisions.

Justice Gray also relied on the "reasonable and necessary" language found in Section 38. However, in her dissenting opinion, she would defer to the Legislature when deciding whether the abortion restrictions were "reasonable and necessary."

When the opinions are read together, four justices (Boomgaarden, Fox, Jarosh, and Fenn) voted to strike down the 2023 abortion laws. Justice Gray voted to uphold the laws. In a footnote, the majority highlighted the State's argument that the language of Article 1, Section 38 was only meant to deal with Obamacare concerns, not abortion choices. The Court recognized it cannot add words to the Wyoming Constitution, that's not its job. But lawmakers could ask Wyoming voters to consider a constitutional amendment that would more clearly address this issue.

# IN THE SUPREME COURT, STATE OF WYOMING

## 2026 WY 1

### OCTOBER TERM, A.D. 2025

### January 6, 2026

STATE OF WYOMING; MARK
GORDON, Governor of Wyoming;
BRIDGET HILL, Attorney General for
the State of Wyoming;

Appellants
(Defendants),

v.

DANIELLE JOHNSON; KATHLEEN
DOW; GIOVANNINA ANTHONY,
M.D.; RENE R. HINKLE, M.D.;
CHELSEA'S FUND; and CIRCLE OF
HOPE HEALTHCARE d/b/a
WELLSPRING HEALTH ACCESS,

Appellees
(Plaintiffs).

S-24-0326

*Appeal from the District Court of Teton County*
*The Honorable Melissa M. Owens, Judge*

*Representing Appellants:*
　　Jay Arthur Jerde, Special Assistant Attorney General. Argument by Mr. Jerde.

*Representing Appellees:*
　　Marci Crank Bramlet, John H. Robinson, Robinson Bramlet LLC, Casper,
　　Wyoming. Peter S. Modlin, Gibson Dunn & Crutcher, LLP, San Francisco,
　　California. Argument by Ms. Bramlet and Mr. Modlin.

*Before BOOMGAARDEN, C.J., and FOX\*, GRAY, FENN, and JAROSH, JJ.*

*BOOMGAARDEN, C.J.; delivers the opinion of the Court; Fenn, J., files a specially concurring opinion; Gray, J., files a dissenting opinion.*

\* Justice Fox retired from judicial office effective May 27, 2025, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (2023), she was reassigned to act on this matter on May 28, 2025.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Chief Justice.**

[¶1]   This appeal presents the question of whether Wyoming's statutes restricting a woman's ability to terminate a pregnancy are constitutional. In deciding this question, we recognize the longstanding debate over abortion and the sincerely and deeply held beliefs of those on each side of that debate. "Abortion is a profoundly difficult and contentious issue because it presents an irreconcilable conflict between the interests of a pregnant woman who seeks an abortion and the interests in protecting fetal life. The interests on both sides of the abortion issue are extraordinarily weighty." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 337, 142 S. Ct. 2228, 2304, 213 L. Ed. 2d 545 (2022) (Kavanaugh, J., concurring).

[¶2]   Article 1, § 38 of the Wyoming Constitution, guarantees each competent adult "the right to make his or her own health care decisions," and it directs the State of Wyoming, of which the judicial branch is a part, "to preserve these rights from undue governmental infringement." The district court concluded Article 1, § 38 establishes a fundamental right to make health care decisions, the decision to have an abortion is a health care decision, and the State was required to justify the statutes restricting access to abortion under the strict scrutiny standard. The court determined the State failed to meet its burden and the Wyoming laws restricting abortion access unreasonably and unnecessarily infringe on this right. Although we recognize the State's interest in protecting the life that an abortion would end, we conclude the State did not meet its burden of justifying the abortion statutes' restrictions on a woman's right to make her own health care decisions, as is expressly protected by the Wyoming Constitution. We therefore affirm.

## *ISSUE*

[¶3]   The parties present numerous issues concerning the constitutionality of the abortion restrictions under several provisions of the Wyoming Constitution. We address a single dispositive issue: Do the Wyoming laws restricting access to abortion unduly infringe on a woman's right to make health care decisions under Article 1, § 38 of the Wyoming Constitution?

## *FACTS*

[¶4]   In 2012, the Wyoming electorate approved Article 1, § 38. That provision states:

> (a) Each competent adult shall have the right to make his or her own health care decisions. The parent, guardian or legal representative of any other natural person shall have the right to make health care decisions for that person.

1

(b) Any person may pay, and a health care provider may accept, direct payment for health care without imposition of penalties or fines for doing so.

(c) The legislature may determine reasonable and necessary restrictions on the rights granted under this section to protect the health and general welfare of the people or to accomplish the other purposes set forth in the Wyoming Constitution.

(d) The state of Wyoming shall act to preserve these rights from undue governmental infringement.

Wyo. Const. art. 1, § 38.

[¶5] In 2023, the Wyoming Legislature enacted two measures restricting abortion (collectively the Abortion Laws).[1] The Life is a Human Right Act (the Life Act), enacted as Wyo. Stat. Ann. §§ 35-6-120 to 35-6-138, prohibits persons from performing abortions in Wyoming, with certain exceptions.[2] Wyo. Stat. Ann. § 35-6-139 (the Medication Ban)

---

[1] The Abortion Laws define abortion as follows:

"Abortion" means the act of using or prescribing any instrument, medicine, drug or any other substance, device or means with the intent to terminate the clinically diagnosable pregnancy of a woman, including the elimination of one (1) or more unborn babies in a multifetal pregnancy, with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn baby. "Abortion" shall not include any use, prescription or means specified in this paragraph if the use, prescription or means are done with the intent to:

(A) Save the life or preserve the health of the unborn baby;

(B) Remove a dead unborn baby caused by spontaneous abortion or intrauterine fetal demise;

(C) Treat a woman for an ectopic pregnancy; or

(D) Treat a woman for cancer or another disease that requires medical treatment which treatment may be fatal or harmful to the unborn baby.

Wyo. Stat. Ann. § 35-6-122(a)(i) (2025).

[2] The Life Act bans abortion as follows:

(a) Except as provided in W.S. 35-6-124, no person shall knowingly:

2

(i) Administer to, prescribe for or sell to any pregnant woman any medicine, drug or other substance with the specific intent of causing or abetting an abortion; or

(ii) Use or employ any instrument, device, means or procedure upon a pregnant woman with the specific intent of causing or abetting an abortion.

Wyo. Stat. Ann. § 35-6-123 (2025).

It sets forth the following exceptions to the abortion ban:

(a) It shall not be a violation of W.S. 35-6-123 for a licensed physician to:

(i) Perform a pre-viability separation procedure necessary in the physician's reasonable medical judgment to prevent the death of the pregnant woman, a substantial risk of death for the pregnant woman because of a physical condition or the serious and permanent impairment of a life-sustaining organ of a pregnant woman, provided that no separation procedure shall be deemed necessary under this paragraph unless the physician makes all reasonable medical efforts under the circumstances to preserve both the life of the pregnant woman and the life of the unborn baby in a manner consistent with reasonable medical judgment;

(ii) Provide medical treatment to a pregnant woman that results in the accidental or unintentional injury to, or the death of, an unborn baby;

(iii) Perform an abortion on a woman when the pregnancy is the result of incest as defined by W.S. 6-4-402 or sexual assault as defined by W.S. 6-2-301. Prior to the performance of any abortion under this paragraph the woman, or the woman's parent or guardian if the woman is a minor or subject to a guardianship, shall report the act of incest or sexual assault to a law enforcement agency and a copy of the report shall be provided to the physician; or

(iv) Perform an abortion on a woman when in the physician's reasonable medical judgment, there is a substantial likelihood that the unborn baby has a lethal fetal anomaly or the pregnancy is determined to be a molar pregnancy.

(b) Nothing in this act shall be construed to prohibit the use, sale, prescription or administration of a contraceptive measure, drug, chemical or device if the contraceptive measure, drug, chemical or device is used, sold, prescribed or administered in accordance with manufacturer instructions and is not used, sold, prescribed or administered with the specific intent to cause or induce an abortion.

Wyo. Stat. Ann. § 35-6-124 (2025). The Life Act defines a "lethal fetal anomaly" as "a fetal condition diagnosed before birth and if the pregnancy results in a live birth there is a substantial likelihood of death of the child within hours of the child's birth." Wyo. Stat. Ann. § 35-6-122(a)(vi).

makes it illegal "to prescribe, dispense, distribute, sell or use any drug for the purpose of procuring or performing an abortion on any person," again with certain exceptions.[3] The Life Act and the Medication Ban impose criminal sanctions and civil penalties for those who violate the statutes. Wyo. Stat. Ann. §§ 35-6-125 to 35-6-126 (2025); Wyo. Stat. Ann. § 35-6-139(c) (2025).

[¶6]   The Life Act became effective on March 17, 2023, and the Medication Ban became effective July 1, 2023. Wyo. Sess. Laws 2023, ch. 184, § 8; Wyo. Sess. Laws 2023, ch. 190, § 1. Plaintiffs[4] immediately filed a complaint in district court against the State and those charged with enforcing the Abortion Laws (collectively the State). Plaintiffs sought a declaration that the Abortion Laws violate the Wyoming Constitution, and they also sought a temporary restraining order and preliminary and permanent injunctions enjoining enforcement of the laws.

---

[3] The Medication Ban provides as follows concerning the prohibited acts and exceptions:

> (a) Notwithstanding any other provision of law, it shall be unlawful to prescribe, dispense, distribute, sell or use any drug for the purpose of procuring or performing an abortion on any person.
>
> (b) The prohibition in subsection (a) shall not apply to:
>
>> (i) The sale, use, prescription or administration of any contraceptive agent administered before conception or before pregnancy can be confirmed through conventional medical testing;
>>
>> (ii) The treatment of a natural miscarriage according to currently accepted medical guidelines;
>>
>> (iii) Treatment necessary to preserve the woman from an imminent peril that substantially endangers her life or health, according to appropriate medical judgment, or the pregnancy is the result of incest as defined by W.S. 6-4-402 or sexual assault as defined by W.S. 6-2-301. As used in this paragraph, "imminent peril" means only a physical condition and shall not include any psychological or emotional conditions. No medical treatment shall form the basis for an exception under this paragraph if it is based on a claim or diagnosis that the pregnant woman will engage in conduct which she intends to result in her death or other self-harm.

Wyo. Stat. Ann. § 35-6-139 (2025).

[4] Plaintiffs include: two physicians specializing in obstetrics and gynecology; an emergency room nurse who treats pregnant women and is herself a mother who plans to have additional children; a woman of the Jewish faith who is of reproductive age and plans to have children; a nonprofit organization that assists in providing access to abortion services through information, funding assistance, and other logistical support necessary to facilitate travel, lodging, and childcare for a woman seeking abortion care; and a nonprofit corporation that operates a clinic and mobile unit providing reproductive health care services, including abortions.

[¶7]   The district court entered temporary restraining orders enjoining enforcement of the Abortion Laws, and Plaintiffs and the State filed cross-motions for summary judgment. The court held a hearing on the summary judgment motions and accepted materials from both sides. The State submitted materials concerning the history of abortion regulation in Wyoming and the history and circumstances surrounding adoption of Article 1, § 38. The Plaintiffs presented their personal affidavits, expert affidavits, and excerpts from governmental and academic reports, publications, and studies. The court concluded the Abortion Laws violate a woman's right to make health care decisions under Article 1, § 38 of the Wyoming Constitution and granted Plaintiffs' summary judgment motion on that ground. The court denied the State's motion in its entirety and entered a permanent injunction enjoining enforcement of the Abortion Laws. The State timely appealed to this Court.

[¶8]   Before turning to our discussion of the parties' claims on appeal, we set forth the legal and evidentiary principles that will guide and inform our analysis of those claims.

## *LEGAL AND EVIDENTIARY FRAMEWORK*

### *I.      The Court's Role in Considering the Constitutionality of the Abortion Laws*

[¶9]   "Unlike the U.S. Constitution, which implies a separation of powers principle from the division of power among the three coordinate branches of the federal government, Wyoming has incorporated an explicit separation of powers article into its constitution." Robert B. Keiter, *The Wyoming State Constitution* 111 (2d ed. 2017). The Wyoming Constitution directs:

> The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted.

Wyo. Const. art. 2, § 1.

[¶10] "This provision precludes one branch of government from exercising authority that belongs to another branch, unless the constitution otherwise authorizes it." *The Wyoming Constitution*, *supra*, at 111. We have said that "[w]hile it is our duty to give great deference to legislative pronouncements and uphold constitutionality when possible, it is likewise our equally imperative duty to declare a legislative enactment invalid if it transgresses the state constitution." *Witzenburger v. State ex rel. Wyoming Cmty. Dev. Auth.*, 575 P.2d 1100,

1114 (Wyo. 1978). And we have recognized that sometimes the role of the judiciary requires it to make rulings that affect the legislative branch. *Billis v. State*, 800 P.2d 401, 414 (Wyo. 1990) ("Under both constitutions the judicial department has and exercises the power to adjudicate and declare legislative enactments unconstitutional, which by its nature injects the judicial department into the business of the legislative department."); *see also Conrad v. Uinta Cnty. Republican Party*, 2023 WY 46, ¶ 13, 529 P.3d 482, 489 (Wyo. 2023) ("It is emphatically the province and duty of the judicial department to say what the law is.") (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)). Despite the Wyoming Constitution's separation of powers mandate and our clear precedent, the State contends that, as there are many philosophic, moral, and religious views on when the protectable life of the fetus arises, the decision on the availability of abortion care is up to the legislature because "it is closest to the people." This position ignores the independent role of the judiciary directed by the Wyoming Constitution.

> Declaring the validity of statutes in relation to the constitution is a power vested in the courts as one of the checks and balances contemplated by the division of government into three departments legislative, executive and judicial ever since first enunciated in *Marbury v. Madison,* 1803, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 and carried forward into Wyoming state government by [Article 2, § 1 of the] Wyoming Constitution.

*Washakie Cnty. Sch. Dist. No. One v. Herschler,* 606 P.2d 310, 318 (Wyo. 1980), *cert. denied*, 449 U.S. 824 (1980).

[¶11] Because this appeal calls on this Court to perform its constitutionally assigned duty to interpret the Wyoming Constitution and the Abortion Laws to determine whether the line drawn by the legislature transgresses a woman's right to make health care decisions, we decline the State's invitation to simply defer to legislative judgment on where that line should or can be drawn.

## II.     Standard of Review and Levels of Scrutiny

[¶12] We review a district court's rulings on summary judgment and the constitutionality of statutes de novo. *Martin v. Bd. of Cnty. Comm'rs of Laramie Cnty.*, 2022 WY 21, ¶¶ 5–6, 503 P.3d 68, 71 (Wyo. 2022). Summary judgment is appropriate when there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law. *Hamann v. Heart Mountain Irrigation Dist.,* 2025 WY 75, ¶ 12, 571 P.3d 1274, 1278 (Wyo. 2025) (quoting *Tilden v. Jackson,* 2025 WY 57, ¶ 12, 568 P.3d 1197, 1202 (Wyo. 2025)). Often, when we are reviewing a summary judgment order, it is because the party against whom summary judgment was granted contends there are disputed issues of material fact and a trial is necessary to resolve them. *See e.g., Tilden,* 2025 WY 57, ¶ 11,

568 P.3d at 1202 (appellant claimed, in a private road action, there were material issues of fact regarding the availability of convenient and reasonable access). In this case, however, the parties presented competing motions for summary judgment and, although the State objected to the district court's consideration of some of the Plaintiffs' evidence on relevancy and other grounds, the State does not dispute the reliability of the information or claim the case should be sent back to the district court for a trial on the facts. Consequently, there are no factual issues which preclude summary judgment. The case before us presents only questions of law.

[¶13] Generally, "[t]he party challenging the constitutionality of a statute bears the burden of proving the statute is unconstitutional." *Gordon v. State*, 2018 WY 32, ¶ 12, 413 P.3d 1093, 1099 (Wyo. 2018) (citation omitted). "That burden is a heavy one in that the appellant must clearly and exactly show the unconstitutionality beyond any reasonable doubt." *Id.* (citation modified). If the right implicated is an ordinary rather than a fundamental right, we apply a rational basis test to determine whether the challenger has met this burden. *Martin*, 2022 WY 21, ¶ 29, 503 P.3d at 77. "Under the rational basis test, we determine whether the statutes are reasonably related to a legitimate government interest." *Sheesley v. State*, 2019 WY 32, ¶ 12, 437 P.3d 830, 836 (Wyo. 2019); *see also Hardison v. State*, 2022 WY 45, ¶ 10, 507 P.3d 36, 40–41 (Wyo. 2022) (the rational basis test considers whether the challenged statute serves a legitimate government interest and the statute is a rational way to serve that interest).

[¶14] "However, when a law disproportionately affects more than ordinary rights . . . , a more critical analysis is warranted." *Martin*, 2022 WY 21, ¶ 14, 503 P.3d at 73.

> [W]here a citizen's fundamental constitutional right . . . is involved[,] the strong presumptions in favor of constitutionality are inverted, [and] the burden then is on the governmental entity to justify the validity of the statute, and this Court has a duty to declare legislative enactments invalid if they transgress a constitutional provision.

*Hardison*, 2022 WY 45, ¶ 5, 507 P.3d at 39 (quoting *Reiter v. State*, 2001 WY 116, ¶ 7, 36 P.3d 586, 589 (Wyo. 2001)) (citation modified). When a statute impacts a fundamental right, we carefully assess the nature of the right considering the express constitutional language from which it is derived to determine whether strict scrutiny or some other test for constitutionality should apply. *Compare Mills v. Reynolds*, 837 P.2d 48, 54 (Wyo. 1992) (applying strict scrutiny to determine whether statutes restricting injured employee's fundamental right, under Article 1, § 8, to access courts to sue co-employees were narrowly tailored to serve a compelling state interest), *with White v. State,* 784 P.2d 1313, 1315–19 (Wyo. 1989) (applying rational basis/relationship test to Wyoming Governmental Claims Act in recognition of Article 1, § 8's express constitutional limitation on individual's right to access court for suits against the state).

7

### III. Rules of Constitutional and Statutory Interpretation

[¶15] We use the same rules to interpret constitutional and statutory provisions. "[W]e are guided primarily by the intent of the drafters." *Gordon*, 2018 WY 32, ¶ 30, 413 P.3d at 1103. "In determining that intent, we look first to the plain and unambiguous language used in the text[.]" *Id*. "If the language is plain and unambiguous, there is no room left for construction." *Id*. "It must be presumed that in case of a constitution the people have intended whatever has been plainly expressed. Courts are not at liberty to depart from that meaning which is plainly declared." *Id*. "To determine what the drafters intended, we attempt to understand the meaning of the words at the time the [provision] was ratified." *Id.*, ¶ 31, 413 P.3d at 1103.

[¶16] Additionally, we follow harmonizing rules when interpreting the constitution and statutes. *Saunders v. Hornecker*, 2015 WY 34, ¶ 19, 344 P.3d 771, 777 (Wyo. 2015).

> Our cases explain that every statement in the constitution must be interpreted in light of the entire document, rather than as a series of sequestered pronouncements, and that the constitution should not be interpreted to render any portion of it meaningless, with all portions of it read in pari materia and every word, clause and sentence considered so that no part will be inoperative or superfluous.

*Saunders*, 2015 WY 34, ¶ 19, 344 P.3d at 777 (citations omitted); *see also Hede v. Gilstrap,* 2005 WY 24, ¶ 6, 107 P.3d 158, 162 (Wyo. 2005) (discussing the same rules in the context of statutory interpretation).

[¶17] When a court determines a statutory or constitutional provision is clear and unambiguous, it gives effect to the plain language and generally will not resort to the rules of construction. *In re Est. of Kirkpatrick,* 2003 WY 125, ¶ 7, 77 P.3d 404, 406 (Wyo. 2003) (citing *Sechrist v. State ex rel. Wyo. Workers' Safety and Comp. Div.,* 2001 WY 45, ¶ 10, 23 P.3d 1138, 1140–41 (Wyo. 2001)). However, if a court determines the language is ambiguous, it may use extrinsic aids of interpretation to help determine the drafters' intent. *Steele v. Neeman,* 6 P.3d 649, 653 (Wyo. 2000). We have also recognized that, in some cases, it is appropriate to use extrinsic aids of construction to confirm our interpretation of the plain language of the provision. *See Solvay Chems., Inc. v. Wyo. Dep't of Revenue,* 2022 WY 122, ¶ 25, 517 P.3d 1123, 1131 (Wyo. 2022); *Parker Land & Cattle Co. v. Wyo. Game & Fish Comm'n,* 845 P.2d 1040, 1043 (Wyo. 1993). Extrinsic aids of construction consider "the mischief the act was intended to cure, the historical setting surrounding its enactment, the public policy of the state, the conditions of the law and all other prior and contemporaneous facts and circumstances that would enable the court intelligently to determine the intention of the lawmaking body." *Parker Land & Cattle Co.*, 845 P.2d at

1044 (quoting *Carter v. Thompson Realty Co.,* 131 P.2d 297, 299 (Wyo. 1942)); *see also Dir. of Off. of State Lands & Invs. v. Merbanco, Inc.,* 2003 WY 73, ¶¶ 36–46, 70 P.3d 241, 253–56 (Wyo. 2003) (discussing historical setting while interpreting constitutional provision).

### IV. *We Overrule the "No-Set-of-Circumstances" Distinction between Facial and As-Applied Constitutional Challenges to Statutes*

[¶18] The State asserts that Plaintiffs' challenges to the Abortion Laws are purely facial and that Plaintiffs must therefore establish that "no set of circumstances exists" under which the abortions laws would be valid. *See Gordon*, 2018 WY 32, ¶ 12, 413 P.3d at 1099 (observing that a facial challenge is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). We disagree that all Plaintiffs' claims are purely facial, but setting that aside, we have previously questioned our continued adherence to this standard in that it is widely criticized by scholars and federal courts alike, including the U.S. Supreme Court. *See id.*, ¶ 12 n.10, 413 P.3d at 1099 n.10. In this case, we honor the reservations we expressed in *Gordon* and follow the lead of the Tenth Circuit Court of Appeals, which, after an extensive examination of U.S. Supreme Court precedent, rejected this distorted and incorrect framing of the distinction between facial and as-applied constitutional challenges. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1123–27 (10th Cir. 2012).

[¶19] The no-set-of-circumstances standard is one we drew from federal precedent interpreting the United States Constitution. *See Dir. of Off. of State Lands & Invs.*, 2003 WY 73, ¶ 32, 70 P.3d at 252 (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) for origin of rule). In *Gordon*, we applied this standard in a state constitutional challenge to a statute, but we commented:

> We adhere to this standard under stare decisis despite the fact that the facial/as-applied distinction has been criticized as "an inherently flawed and fundamentally incoherent undertaking." Alex Kreit, *Making Sense of Facial and As-Applied Challenges*, 18 Wm. & Mary Bill Rts J. 657, 659 (2010). *See also* Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 239–41 (1994) (contending that courts regularly accept challenges that would fail the "no set of circumstances" test). We do so even though the United States Supreme Court has expressed reservations about the supposedly bright line between facial and as-applied analysis. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331, 130 S.Ct. 876, 893, 175 L.Ed. 2d 753 (2010) ("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must

always control the pleadings and disposition in every case involving a constitutional challenge.").

2018 WY 32, ¶ 12 n.10, 413 P.3d at 1099 n.10; *see also United States v. Streett*, 434 F.Supp.3d 1125, 1168 n.18 (D. N.M. 2020) ("The Tenth Circuit and leading commentators contend that the formulation in *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), is neither normatively desirable nor—more importantly for the Court's purposes—descriptively accurate."); Richard H. Fallon, Jr., *Fact and Fiction About Facial Challenges*, 99 Calif. L. Rev. 915, 936–49 (2011) (examining empirical evidence and concluding that the Supreme Court regularly facially invalidates laws, and ignores the purported standard when it does).

[¶20] In rejecting the no-set-of-circumstances or *Salerno* standard as a valid articulation of the standard applicable to facial challenges, the Tenth Circuit observed:

> [The no-set-of-circumstances standard] completely divorces review of the constitutionality of a statute from the terms of the statute itself, and instead improperly requires a court to engage in hypothetical musings about potentially valid *applications* of the statute. The Supreme Court has repeatedly entertained facial challenges without engaging in this hypothetical exercise. Instead, the Court has properly applied the appropriate constitutional test to the restriction at issue[.]

*Doe*, 667 F.3d at 1123 (followed by a lengthy review of U.S. Supreme Court decisions); *see also City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (plurality opinion) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself[.]").

[¶21] We have recognized that the doctrine of stare decisis serves important values, such as consistency, reliance, and the integrity of the judicial process, but we have also observed that it is not an "inexorable command." *Smith v. Bd. of Cnty. Comm'rs of Park Cnty.*, 2013 WY 3, ¶ 15, 291 P.3d 947, 952 (Wyo. 2013). "When precedential decisions are no longer workable, or are poorly reasoned, we should not feel compelled to follow precedent. Stare decisis is a policy doctrine and should not require automatic conformance to past decisions." *Bienz v. Bd. of Cnty. Comm'rs, Cnty. of Albany*, 2024 WY 102, ¶ 20 n.5, 556 P.3d 227, 235 n.5 (Wyo. 2024) (quoting *Brown v. City of Casper*, 2011 WY 35, ¶ 43, 248 P.3d 1136, 1146 (Wyo. 2011)).

[¶22] We see no value in adhering to a standard that has been criticized as a distortion of the analysis the U.S. Supreme Court itself conducts in cases involving facial challenges; a standard the Supreme Court itself routinely ignores, *Doe*, 667 F.3d at 1123–27; and a

standard that invites an analysis based on hypothetical scenarios rather than the terms of a statute that the facial challenge is meant to focus on. This is particularly so since we have said that we will not blindly adhere to federal precedent when interpreting our own constitution and instead will do so only when we find it persuasive. *Fertig v. State*, 2006 WY 148, ¶ 17, 146 P.3d 492, 497 (Wyo. 2006). We therefore overrule our prior reliance on the no-set-of-circumstances standard in evaluating facial challenges and instead adopt the approach framed as follows by the Tenth Circuit:

> [A] facial challenge is just that—a challenge to the terms of the statute, not hypothetical applications. *Salerno*'s language thus is accurately understood not as setting forth a *test* for facial challenges, but rather as describing the *result* of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard. In other words, where a statute fails the relevant constitutional test (such as strict scrutiny . . . or reasonableness review), it can no longer be constitutionally applied to anyone—and thus there is "no set of circumstances" in which the statute would be valid. The relevant constitutional test, however, remains the proper inquiry.

*Doe*, 667 F.3d at 1127 (citation modified); *see also Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 n. 6, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Ezell v. City of Chicago*, 651 F.3d 684, 698–99 (7th Cir. 2011) ( "In a facial challenge like this one, the claimed constitutional violation inheres in the terms of the statute, not its application. . . . [A] successful facial attack means the statute is wholly invalid and cannot be applied to anyone. Chicago's law, if unconstitutional, is unconstitutional without regard to its application—or in all its applications, as *Salerno* requires."); *Rothe Dev. Corp. v. Dep't of Defense*, 413 F.3d 1327, 1337–38 (Fed. Cir. 2005) ("*Salerno* is of limited relevance here, at most describing a conclusion that could result from the application of the strict scrutiny test.").

[¶23] Our inquiry in resolving Plaintiffs' claims, whether they are properly characterized as facial challenges or as-applied challenges, will be the same. We will determine the relevant constitutional test and apply that test.

## V.     *Evidentiary Framework*

[¶24] Evidence has a specialized role in determining the constitutionality of a statute, especially in the context of a summary judgment proceeding. The law distinguishes between adjudicative and legislative facts. Adjudicative facts "relate to identifiable parties and specific situations" and are determined through an evidentiary hearing. *Campbell v. Dep't of Fam. Servs.*, 881 P.2d 1066, 1070 (Wyo. 1994). Judicial decision-making, most often, involves determination of adjudicative facts "relating to the parties and their

particular circumstances." *Varnum v. Brien*, 763 N.W.2d 862, 881 (Iowa 2009); s*ee also Scarlett v. Town Council, Town of Jackson, Teton Cnty.*, 463 P.2d 26, 29 n. 5 (Wyo. 1969) (adjudicative facts "are the facts that normally go to the jury in a jury case") (quoting 2 Davis, *Administrative Law Treatise*, § 15.03, p. 353 (1958)). "[T]he resolution of a dispute over [adjudicative] facts is done within the framework of a set of rules to determine the admissibility of evidence tending to prove such facts." *Varnum,* 763 N.W.2d at 881. Thus, a court may grant summary judgment in a case which presents questions of adjudicative facts only when there is no material dispute as to those facts.

[¶25] Legislative facts, on the other hand, "are ordinarily general and do not concern the immediate parties but help the tribunal determine the content of law and of policy." *Campbell*, 881 P.2d at 1070. Legislative facts are relevant to understand the lawmaking process and the rationale used by a legislative body in enacting a statute. *See* Fed. R. Evid. 201 advisory committee note to Subdivision (a); *see also,* C. Mueller & L. Kirkpatrick, 1 *Federal Evidence* § 2:12 (4th ed. July 2025 update) ("legislative facts involve values and appraisals of the nature and ways of the world, undertaken in an effort to give meaning to law in light of important ends, in an effort at defining the meaning, reach and limits, and application of legal rules"). "Legislative facts are relevant in deciding . . . constitutional issues because courts must normally analyze 'whether there exist circumstances which constitutionally either legitimate the exercise of legislative power or substantiate the rationality of the legislative product.'" *Varnum*, 763 N.W.2d at 881 (quoting 2 John W. Strong, *McCormick on Evidence* § 328, at 370 (5th ed. 1999)). In other words, legislative facts are useful to help the court determine whether a challenged statute passes muster under the appropriate level of constitutional scrutiny, i.e., whether the statute serves a legitimate government interest through rational means, or whether the statute is justified by a compelling state interest and is narrowly tailored to meet that interest. *See e.g., Armour v. City of Indianapolis,* 566 U.S. 673, 681–84, 132 S.Ct. 2073, 2080–82, 182 L.Ed.2d 998 (2012) (referencing "the legislative facts on which the classification is apparently based" in applying the rational basis test for constitutionality); *Fisher v. Univ. of Texas,* 579 U.S. 365, 381–88, 136 S.Ct. 2198, 2210–14, 195 L.Ed.2d 511 (2016) (discussing evidence the university presented to justify its race-based admissions program under strict scrutiny).

[¶26] When used in deciding the constitutionality of statutes, legislative facts are also referred to as constitutional facts. *Varnum*, 763 N.W.2d at 881. Constitutional facts are those which "assist a court in forming a judgment on a question of constitutional law." *Id.* (quoting Kenneth Culp Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv. L. Rev. 364, 403 (1942)). They include social and economic data and may come into a case in various ways including through the evidence and submissions by the parties. K. Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv. L. Rev. at 403; *see also Varnum*, 763 N.W.2d at 881 (noting that constitutional facts may be admitted through witness testimony).

[¶27] The case before us does not present conflicts of adjudicative facts. However, the parties offer different views of the appropriate scope of legislative facts. The State contends the only relevant legislative facts are: 1) the history of state regulation of abortion; 2) the history of Article 1, § 38 of the Wyoming Constitution; and 3) the circumstances surrounding ratification of Article 1, § 38.[5] The State submitted information from the Wyoming Secretary of State website describing the proposed amendment to add Article 1, § 38 to the Wyoming Constitution's declaration of rights, and magazine, newspaper, and website articles concerning the amendment. These documents showed there was no discussion of abortion rights surrounding the amendment, and the articles further showed the amendment was reported as a response to the individual health insurance mandate in the federal Patient Protection and Affordable Care Act. The State offered this evidence to assist the district court in interpreting the constitution and the Abortion Laws and to help define the history, meanings, and purposes of the provisions.

[¶28] The Plaintiffs, on the other hand, offered a variety of evidence as legislative facts in support of their interpretation of Article 1, § 38 and the Abortion Laws and their claim the laws do not survive the strict scrutiny test. Plaintiff's evidence included expert affidavits, Plaintiffs' affidavits, and excerpts from governmental reports, publications, and studies. The affidavits from the plaintiff physicians, Rene R. Hinkle, M.D. and Giovannina Anthony, M.D., attested to facts based on their professional education and experience, as did Plaintiffs' expert, Dr. Ghazaleh Kinney Moayedi. These witnesses also supported their affidavits with citations to, and copies of, numerous studies, reports, and professional publications, including but not limited to publications of: the American College of Obstetricians and Gynecologists; the Wyoming Department of Health; the U.S. Department of Health and Human Services; the World Health Organization; the National Academies of Sciences, Engineering, and Medicine; and the Centers for Disease Control and Prevention (CDC). Plaintiffs' expert Michael Blonigen attested to facts based on his many years of experience as a prosecuting attorney, including over 200 jury trials for crimes that included sexual assault and child sexual abuse.

[¶29] While the State objected to Plaintiffs' evidence on grounds of relevance, based on its narrow definition of legislative facts, and moved to strike Plaintiffs' expert witnesses on grounds that some of the ultimate opinions were conclusions of law or outside the experts' field of expertise, it did not offer its own evidence to refute Plaintiffs' evidence or challenge its reliability. Moreover, the State has not challenged the district court's order denying the State's motion to strike, other than to maintain its argument that Plaintiffs' evidence strayed beyond permissible legislative facts.

---

[5] Much of this evidence also falls under the umbrella of extrinsic aids in interpreting statutory and constitutional provisions, which we can consider when the language is ambiguous or to confirm our interpretation of the plain language of the provisions. *See Solvay Chems., Inc.,* 2022 WY 122, ¶ 25, 517 P.3d at 1131; *Parker Land & Cattle Co.,* 845 P.2d at 1043.

13

[¶30] We disagree with the State's narrow definition of legislative facts. The United States Supreme Court has repeatedly recognized a much broader use of legislative facts in determining whether statutes contravene constitutional provisions. *See e.g.*, *Reno v. Am. C.L. Union*, 521 U.S. 844, 849 n.2, 878, 117 S.Ct. 2329, 2334 n.2, 2348, (1997) (in a challenge to a law restricting sexual content on the internet, the Court referred to the trial court's "410 findings, including 356 paragraphs of the parties' stipulation and 54 findings based on evidence received in open court" and the testimony of the government's expert witness in analyzing the law's impact); *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 888–894, 112 S.Ct. 2791, 2826–2829, 120 L.Ed.2d 674 (1992) *overruled on other grounds by Dobbs*, 597 U.S. 215, 142 S.Ct. 2228 (considering trial court's findings of fact based on testimony of numerous expert witnesses as well as multiple studies to conclude that spousal notification restriction created a substantial obstacle to abortion access); *Brown v. Bd. of Educ.*, 347 U.S. 483, 495 n.11, 745 S.Ct. 686, 692 n.11, 98 L.Ed. 873 (1954) (relying on studies of the psychological effects of racial segregation to reach holding that segregation violates the Fourteenth Amendment); *Minn. v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981) ("[P]arties challenging legislation under the Equal Protection Clause may introduce evidence supporting their claim that it is irrational."); *see also Varnum*, 763 N.W.2d at 881 (finding error in trial court's exclusion of testimony and holding "we review all of the material tendered by the parties in this case to assist us in our review of the constitutionality of the civil marriage statute"); *State ex rel. T.B. v. CPC Fairfax Hosp.*, 918 P.2d 497, 504 (Wash. 1996) (en banc) (declining to strike scholarly articles and excerpts and noting "we do not understand nor do we consider these authorities to establish the specific facts of this case but rather 'legislative facts' which the court may consider when determining the constitutionality or interpretation of a statute").

[¶31] The State urges this Court to apply an unduly narrow definition of legislative facts that is unsupported by authority and would essentially force us to decide this case with blinders on.[6] Based on the authority discussed above, we decline to limit our consideration

---

[6] In its reply brief, the State contends that application of the strict scrutiny test to restriction of a fundamental right is a question of law, citing *State v. Hardesty*, 214 P.3d 1004, 1007 (Ariz. 2009); *Lomack v. City of Newark*, 463 F.3d 303, 307 (3d Cir. 2006); and *Citizens Concerned About Our Child v. Sch. Bd. of Broward Cnty., Fla.*, 193 F.3d 1285, 1292 (11th Cir. 1999). These cases do not support the State's assertion that evidence is irrelevant to application of the test. While the determination of whether the strict scrutiny test applies and if so, whether the test has been satisfied, is a question of law, that does not mean the facts are irrelevant to those determinations. *See Operation Save Am. v. City of Jackson,* 2012 WY 51, ¶¶ 78, 80, 275 P.3d 438, 461–62 (Wyo. 2012) (finding no evidence in record to support town's asserted compelling government interests); *Hodes & Nauser, MDs, P.A. v. Kobach*, 551 P.3d 37, 49 (Kan. 2024) (*Hodes & Nauser II*) ("A robust argument from the government that its action or legislation is precisely tailored to furthering its interests will rely on actual evidence of such precision."); *Doe*, 667 F.3d at 1134 ("The City provided nothing in the record that could satisfy its obligation of proving that the ban is narrowly tailored."). That those determinations pose questions of law means only that a court (rather than the jury) makes the determination and that our review is de novo, not that the trial or appellate court should disregard relevant evidence.

to the materials proffered by the State. To the extent they are reliable and relevant to the specific issues before us, we will consider the materials and evidence of both parties.

## *DISCUSSION*

[¶32] To reiterate, Article 1, § 38 of the Wyoming Constitution provides:

> (a) Each competent adult shall have the right to make his or her own health care decisions. The parent, guardian or legal representative of any other natural person shall have the right to make health care decisions for that person.
>
> (b) Any person may pay, and a health care provider may accept, direct payment for health care without imposition of penalties or fines for doing so.
>
> (c) The legislature may determine reasonable and necessary restrictions on the rights granted under this section to protect the health and general welfare of the people or to accomplish the other purposes set forth in the Wyoming Constitution.
>
> (d) The state of Wyoming shall act to preserve these rights from undue governmental infringement.

[¶33] In determining the constitutionality of the Abortion Laws under this provision, we first address the State's arguments that an abortion is not health care and even if it were considered health care, the decision to have an abortion is not a woman's own health care decision because it affects the separate life of the fetus. We then turn to whether the right is fundamental and the question of what level of scrutiny the laws must pass. Lastly, we analyze the laws under the applicable level of scrutiny.

## I.     *The decision whether to terminate or continue a pregnancy is a health care decision under Article 1, § 38.*

[¶34] At the outset, and before turning to our interpretation of Article 1, § 38, we reject the State's argument that we should defer to the legislature's finding in the Life Act that "abortion as defined in this act is not health care. Instead of being health care, abortion is the intentional termination of the life of an unborn baby." Wyo. Stat. Ann. § 35-6-121(a)(iv) (2025). As the Tenth Circuit stated in *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 591 n.2 (10th Cir. 1999), a "statute does not and cannot define the scope of constitutional rights." *See also Powell v. Hocker*, 516 S.W.3d 488, 494 (Tex. Crim. App. 2017) (rejecting argument that a constitutional term could be statutorily defined on ground that such a term means what a court interprets it to mean not "what the [l]egislature may

declare it to mean, as a matter of statutory definition"). Thus, the legislature's findings on the definition of health care cannot and do not define the scope of the right created by Article 1, § 38. As we stated in our earlier discussion, it is the exclusive province of this Court to interpret the Wyoming Constitution. *Conrad*, 2023 WY 46, ¶ 13, 529 P.3d at 489 ("It is emphatically the province and duty of the judicial department to say what the law is." (citation omitted)).

[¶35] For this same reason, we reject the State's argument that because the legislature regulates medical care in Wyoming, an individual's right to make health care decisions depends on the legislature first saying the medical service in question is permissible. Certainly, the legislature enacts laws that regulate medical care in the state, but when such a law restricts an individual's constitutional right to make a health care decision, this Court must interpret the constitution and determine whether the restriction is permissible. *See State v. Lancaster*, 519 P.3d 1176, 1182 (Idaho 2022) (to allow statutes to determine constitutional content would elevate them to the level of the constitution); *City of Fernley v. State Dep't of Tax'n*, 366 P.3d 699, 706 (Nev. 2016) ("Statutes are construed to accord with constitutions, not vice versa."). Were we to hold otherwise, the Article 1, § 38 right to make health care decisions would be illusory.

[¶36] We turn then to the scope of Article 1, § 38, and specifically whether the phrase "health care" includes abortion care. To understand the meaning of terms used in a constitutional provision, we look to their plain meaning at the time the provision was ratified. *Gordon*, 2018 WY 32, ¶ 31, 413 P.3d at 1103. In 2012, the phrase "health care" was defined as "efforts made to maintain or restore health especially by trained and licensed professionals." *Health Care*, Merriam-Webster, https:/ /web.archive.org/ web/20120121070632/https://www.merriam-webster.com/dictionary/health%20care (last visited Jan. 5, 2026). The term "health" was defined as "the condition of being sound in body, mind, or spirit; [especially]: freedom from physical disease or pain." *Health*, Merriam-Webster, https://web.archive.org/ web/20120112114508/https://www.merriam-webster.com /dictionary /health (last visited Jan. 5, 2026). And the term "decision" meant "a determination arrived at after consideration." *Decision*, Merriam-Webster, https://web.archive.org/web/20120110113101/https://www.merriam-webster. com/ dictionary/ decision (last visited Jan. 5, 2026).

[¶37] The State agrees with these definitions, but it focuses on the example of "freedom from physical disease or pain," contained within the definition of the term "health." Based on that single example, the State urges a narrow definition of "health care decisions," which it contends would include only a "determination regarding the procurement of medical services to maintain the physical condition of the individual or to restore her condition from physical disease or pain." It then argues that to constitute health care an abortion "must be intended to maintain the physical condition of the pregnant woman or to restore her condition from physical disease or pain." The State's path to this restrictive meaning is

16

to ignore most of the definition of health on which it relies—"the condition of being sound in body, mind, or spirit"—and the definition of "abortion" at § 35-6-122(a)(i) as a medical procedure. This approach finds no support in our rules of constitutional interpretation, and notably, the State points to no state or federal precedent suggesting that legal abortion care is not health care.

[¶38] The record shows that abortions are medical procedures performed or administered by qualified medical professionals. The Plaintiffs presented evidence showing pregnancy can cause and exacerbate certain physical and mental health conditions. Drs. Hinkle and Anthony, who both practice obstetrics and gynecology in Wyoming, presented affidavits as evidence in this case. They stated pregnancy can lead to the development of new and serious health conditions such as hyperemesis gravidarum (excessive nausea and vomiting), preeclampsia, deep vein thrombosis, and gestational diabetes. Pregnancy can also exacerbate preexisting conditions such as diabetes, kidney disease, hypertension and other cardiac diseases, obesity, asthma, autoimmune disorders, and other pulmonary diseases. In fact, the physical complications of pregnancy have been a leading cause of death in reproductive age women.

[¶39] Furthermore, the record shows pregnancy can induce or exacerbate mental health conditions. Citing to information from the CDC, Dr. Moayedi noted in her affidavit that mental health conditions are the leading cause of maternal death in the United States with almost one-quarter of pregnancy-related deaths directly linked to mental health conditions. Labor and childbirth also present risks that can become life threatening. Citing data from the National Academies of Science, Engineering, and Medicine, Dr. Anthony pointed out that a woman's risk of death associated with pregnancy and childbirth is more than twelve times higher than the risk of death associated with legal abortion.

[¶40] Thus, pregnancy comes with physical and emotional challenges and risks that affect "the condition of being sound in body, mind, or spirit." *Health Care, supra; Health, supra.* As a medical means to address the adverse effects of pregnancy and "restore" a woman to a "condition of being sound in body, mind, or spirit; [especially]: freedom from physical disease or pain," abortion is "health care," in accordance with the plain meaning of that phrase in Article 1, § 38. *Health Care, supra; Health, supra.* We, therefore, conclude that the phrase "health care" includes abortion care and that the decision whether to terminate or continue a pregnancy is a "health care decision." Wyo. Const. art. 1, § 38(a).

[¶41] We are not persuaded otherwise by the State's citation of materials showing the political climate surrounding the adoption of Article 1, § 38. The State points out the amendment was put to the voters in response to the Affordable Care Act, with no discussion of abortion care. The record supports this assertion, and we do not disagree. However, that does not change the fact that the plain language of the amendment the voters ratified went beyond addressing concerns with the Affordable Care Act and granted "[e]ach competent adult" "the right to make his or her own health care decisions." There is nothing in the plain

17

language of the amendment which indicates abortion is not health care or otherwise limits access to abortion care. The plain meaning of the provision controls, and we are not at liberty to read restrictions into that language.[7] *Gordon*, 2018 WY 32, ¶ 30, 413 P.3d at 1103 ("It must be presumed that in case of a constitution the people have intended whatever has been plainly expressed. Courts are not at liberty to depart from that meaning which is plainly declared."); *Delcon Partners LLC v. Wyo. Dep't of Revenue*, 2019 WY 106, ¶ 10, 450 P.3d 682, 685 (Wyo. 2019) (court may not add or change words in the guise of interpretation).

## II.    *The decision whether to terminate or continue a pregnancy is a woman's own health care decision.*

[¶42] The State contends that even if abortion care is considered health care, the decision to have an abortion is not a woman's "own" health care decision because it ends the separate life of the fetus.

[¶43] The record shows a pregnant woman's decision to continue or terminate a pregnancy is influenced by many considerations, all of them personal to the pregnant woman and her individual circumstances. These considerations may include physical and mental health, finances, educational and career plans, personal relationships with her existing children and/or partner, and religious beliefs. Although a woman's decision to have an abortion ends the fetal life, the decision is, nevertheless, one she makes concerning her own health care.

[¶44] The State's argument essentially conflates two questions that must be kept separate: 1) whether an abortion is an individual health care decision that a woman makes for herself based on her own beliefs and circumstances; and 2) whether and to what extent that decision may be restricted by the State given it ends the fetal life. Because we have interpreted the phrase "health care" to include abortion care, the answer to the first question must be that a woman making the decision whether to have an abortion is making her own health care decision. The answer to the second question is the central issue in this appeal, which we address *infra*, at section V.

---

[7] Our task is to interpret Article 1, § 38 according to its plain terms. If as the State contends, the people did not intend to include abortion care among the health care decisions this constitutional amendment protects, the solution is not for this Court to add language to the constitution. It is beyond our power to do that. The Legislature, however, could put the question to the people of Wyoming in the form of a constitutional amendment that clearly states what it seeks to accomplish. *See Planned Parenthood S. Atl. v. State*, 882 S.E.2d 770, 781 (S.C. 2023) ("The Tennessee Supreme Court interpreted the language and history of the right to privacy and found it encompassed the abortion decision, and the citizens of Tennessee responded by voting to amend their constitution's text."); *Planned Parenthood of Mont. v. State by and through Knudsen,* 570 P.3d 51, 71–72 (Mont. 2025) (noting the Montana Constitution had been amended to expressly provide "a right to make and carry out decisions about one's own pregnancy, including the right to abortion" (quoting Mont. Const. art. II, § 36)).

### III. An individual's right to make health care decisions under Article 1, § 38 is a fundamental right.

[¶45] As we address whether Article 1, § 38 confers a fundamental right, we must emphasize that the right this provision confers is not the narrow right to make a decision concerning abortion care. The right it confers is the right of every competent adult to make his or her own health care decisions, and thus the question we are answering is whether the right to make one's own health care decisions is a fundamental right.

[¶46] In *Mills*, 837 P.2d at 53, we said "[a] fundamental right is a right which the constitution explicitly or implicitly guarantees." *See also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973) (the key to determining whether a right is fundamental is whether it is "explicitly or implicitly guaranteed by the Constitution"); *In re Honeycutt*, 908 P.2d 976, 979 (Wyo. 1995) ("A fundamental right is a right which is guaranteed explicitly or implicitly by the constitution."); *Armstrong v. State*, 989 P.2d 364, 374 (Mont. 1999) ("[S]ince the right of privacy is explicit in the Declaration of Rights of Montana's Constitution, it is a fundamental right."). Article 1, § 38 explicitly guarantees the right to make one's own health care decisions, which, under cases like *Mills,* signifies the right is fundamental.

[¶47] Wyoming's explicit protection of the right to make personal health decisions in Article 1, § 38 appears to be unique. Other states have recognized a fundamental right to make health care decisions under less explicit constitutional provisions. For example, Montana's constitution contains an express right to privacy, which its supreme court has interpreted as guaranteeing "each individual the [fundamental] right to make medical judgments affecting her or his bodily integrity and health, in partnership with a chosen health care provider free from governmental interference." *Planned Parenthood of Mont. v. State,* 554 P.3d 153, 165 (Mont. 2024) (citing *Armstrong,* 989 P.2d at 370); s*ee also, Rasmussen v. Fleming,* 741 P.2d 674, 682 (Ariz. 1987) (en banc) (holding express right to privacy in state constitution included the fundamental right to make medical decisions); *In re Guardianship of Barry,* 445 So.2d 365, 369–70 (Fla. Dist. Ct. App. 1984) (express right of privacy in state constitution encompassed decisions affecting medical treatment). When interpreting their respective state constitution's right to privacy provisions, these courts have found those express provisions to contain an implied fundamental right to make medical or health care decisions. For example, in *Armstrong,* 989 P.2d at 371–76, the Montana Supreme Court reviewed the history of its state constitution's right to privacy provision to conclude the convention delegates intended it to encompass protection of Montana citizens' right to make their own medical decisions. Because Article 1, § 38 explicitly guarantees the right to make one's own health care decisions and the Wyoming Constitution does not contain an express right to privacy provision, a substantive due process analysis is not necessary here. *See e.g.*, *Vaughn v. State,* 2017 WY 29, ¶¶ 26–29, 391 P.3d 1086, 1095–96 (Wyo. 2017) (refusing to recognize, under substantive due

process, a fundamental right protecting juveniles convicted of certain crimes from having to register as sex offenders); *DS v. Dep't of Pub. Assistance & Soc. Servs.,* 607 P.2d 911, 918–19 (Wyo. 1980) (recognizing the right to familial association is fundamental under substantive due process).

[¶48] Given our precedent clearly states a right expressly granted in the constitution is fundamental and Article 1, § 38 explicitly grants Wyoming citizens the right to make personal health care decisions, we conclude that right is indeed a fundamental one.[8]

## IV. *A law restricting a person's fundamental right to make health care decisions is subject to strict scrutiny.*

[¶49] Our next task is to determine how to test the constitutionality of the Abortion Laws' restrictions on the fundamental right to make health care decisions. As we explain below, precedent directs us to consider the nature of the right granted in Article 1, § 38 and the express language of the constitutional provision in determining the appropriate test for constitutionality.

[¶50] As an attribute of its sovereignty, the legislature is authorized to use its police power "to enact laws for the health, safety, comfort, moral and general welfare of the people[.]" *State v. Langley,* 84 P.2d 767, 770 (Wyo. 1938). However, the legislature's police powers are limited by individual constitutional rights. *See Bd. of Cnty. Comm'nrs of Teton Cnty. v. Crow,* 2003 WY 40, ¶ 19, 65 P.3d 720, 727 (Wyo. 2003) (federal and state constitutions impose limits on governmental exercise of police powers); *Michael v. Hertzler,* 900 P.2d 1144, 1149 (Wyo. 1995) (recognizing the state has power to adopt laws for the well-being of its citizens but it is limited by the constitution). Under separation of powers principles, the judiciary is "the final authority on constitutional questions" and has "the constitutional duty to declare unconstitutional [statutes] which transgress[] the state constitution." *Campbell Cnty. Sch. Dist. v. State,* 907 P.2d 1238, 1264 (Wyo. 1995) (citing *Washakie,* 606 P.2d at 319; *Bulova Watch Co. v. Zale Jewelry Co. of Cheyenne,* 371 P.2d 409, 419 (Wyo. 1962)).

[¶51] While exercising this duty, courts are tasked with deciding, as a matter of law, the test to apply when the constitutionality of a statute is challenged. *Hardison,* 2022 WY 45, ¶ 5, 507 P.3d at 39 (courts determine the constitutionality of statutes as a matter of law);

---

[8] It was no accident that Article 1, § 38 was placed in the Declaration of Rights. It was initially introduced as a senate joint resolution to create a new section 24 in Article 7 of the constitution, the article governing the promotion of health and morals. Senator John Schiffer offered an amendment that was approved and moved the amendment to Article 1, the Declaration of Rights. Senator Schiffer explained the reason for his proposed amendment, which was ultimately approved. He said, "Article 1 is where we empower the people, where we say these are your rights. There's, I think, 37 of them. I'm suggest—I'm suggesting we need a 38. We're saying, people, this belongs to you, and—and—and you can cherish it, you can use it, you can do what you wish with it, but we're going to give it to you."

*Gordon,* 2018 WY 32, ¶ 55, 413 P.3d at 1109 (under separation of powers principles, courts have authority to determine the constitutional validity of statutes) (citing Wyo. Const. art. 2, § 1 (the powers of the government are divided between the three branches)). In general, we choose between two levels of review—the rational relationship (or rational basis) test and the strict scrutiny test—based upon the nature of the constitutional right.[9] The rational relationship or rational basis test is used when a statute "only affects ordinary interests in the economic and social welfare area[.]" *Hageman v. Goshen Cnty. Sch. Dist. No. 1,* 2011 WY 91, ¶ 54, 256 P.3d 487, 503 (Wyo. 2011) (quoting *Ellett v. State,* 883 P.2d 940, 944 (Wyo. 1994)) (other citation omitted); s*ee also Cheyenne Airport Bd. v. Rogers,* 707 P.2d 717, 727 (Wyo. 1985) ("When the legislative enactment lies in the economic and social welfare area, and when there are no suspect criteria or fundamental interests involved, the court will, in testing the enactment, inquire only as to whether the regulation is of debatable reasonableness."). Under the rational relationship test, the law will be sustained if it is rationally related to a legitimate state objective. *White,* 784 P.2d at 1315.

[¶52] In contrast, strict scrutiny is often applied when a statute impacts a fundamental constitutional right. *Martin,* 2022 WY 21, ¶ 14, 503 P.3d at 73. Applying the strict scrutiny test, the Court closely analyzes the statute "to determine if it is necessary to achieve a compelling state interest. In addition, the burden is on the State to demonstrate that it could not use a less onerous alternative to achieve its objective." *Id.* (quoting *Mills,* 837 P.2d at 53). Stated otherwise, the State bears the burden of proving the statute is necessary to further a "compelling government interest and that the interest cannot be served in a less restrictive manner." *Operation Save Am. v. City of Jackson,* 2012 WY 51, ¶ 75, 275 P.3d 438, 467 (Wyo. 2012); *see also Hardison*, 2022 WY 45, ¶ 5, 507 P.3d at 39 (when a fundamental constitutional right is involved, "[t]he strong presumptions in favor of constitutionality are inverted," and the burden shifts to the State to "justify the validity of the statute[.]" (quoting *Reiter*, 2001 WY 116, ¶ 7, 36 P.3d at 589)).

[¶53] In *Mills,* 837 P.2d at 52–54, we used the strict scrutiny test to determine whether a worker's compensation statute that made co-employees immune from suit by an injured employee was constitutional. Strict scrutiny was appropriate because Article 1, § 8 established a fundamental right by guaranteeing "[a]ll courts shall be open and every person for an injury done to person, reputation or property shall have justice administered without sale, denial or delay." *Id.* at 53–54. In *Campbell Cnty. Sch. Dist.,* 907 P.2d at 1266–67, we stated the Wyoming constitution guaranteed students a fundamental right to an "equal opportunity to a proper public education[.]" Any statute which interfered with the fundamental right was not "entitled to the usual presumption of validity," and the State was

---

[9] "An intermediate level of scrutiny applies to a small number of classifications, including those based upon gender. Under intermediate scrutiny, the classification must be substantially related to an important governmental interest." *Martin,* 2022 WY 21, ¶ 14 n.4, 503 P.3d at 73 n.4 (citing *Craig v. Boren*, 429 U.S. 190, 197–98, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976)) (other citations omitted).

required to show "its interference with that right [was] forced by some compelling state interest and its interference [was] the least onerous means of accomplishing that objective." *Id.* (citing *Miller v. City of Laramie,* 880 P.2d 594, 597 (Wyo. 1994)).

[¶54] There are instances, however, when we do not apply strict scrutiny to statutes which purportedly infringe on fundamental constitutional rights because the express language of the constitution suggests a more appropriate test. For example, Wyoming Constitution Article 1, § 4 explicitly protects citizens' right to be free from unreasonable searches and seizures. In *Almada v. State,* 994 P.2d 299, 308–10 (Wyo. 1999), we tested the constitutionality, under Article 1, § 4, of a statute which allowed wiretapping without a warrant in certain circumstances. The test we applied considered whether the statute violated a citizen's reasonable expectation of privacy and, if so, whether the State demonstrated the violation was unreasonable. *Id.* at 309. Our inquiry into the reasonableness of the statute was based upon the language of Article 1, § 4, which only prohibits ***unreasonable*** searches and seizures. *Id*.; *see also Owens v. State,* 2012 WY 14, ¶ 10, 269 P.3d 1093, 1096 (Wyo. 2012) ("When a search is conducted without a warrant, the State has the burden to show that the search was reasonable.").

[¶55] In *White,* 784 P.2d at 1314–22, we considered a constitutional challenge under Article 1, § 8, to the Wyoming Governmental Claims Act's restriction on suits against the Wyoming Highway Department. Like in our later decision in *Mills,* we recognized Article 1, § 8 protected individuals' right to access the court system but noted the second sentence of the constitutional provision expressly allowed suits to be "brought against the state in such manner and in such courts as the legislature may by law direct." *White,* 784 P.2d at 1316–17 (italics omitted). We concluded the second sentence established "a direct limitation on [the] right of the people, as declared in the first sentence of Article 1, § 8." *Id.* Thus, "legislative decisions concerning the retention or abrogation of governmental immunity to suit are only subject to" a reasonableness standard, not "a heightened level of scrutiny." *Id.*

[¶56] Our precedent, therefore, teaches that courts determine the level of constitutional scrutiny by considering the nature of the right guaranteed in the constitution and the express language of the constitutional provision.[10] Applying these principles to Article 1, § 38, we start with our earlier conclusion that the provision expressly grants a fundamental right to citizens to make their own health care decisions. Cases like *Martin, Mills,* and *Campbell*

---

[10] In this respect, we agree with the sentiment expressed in Justice Fenn's special concurrence and Justice Gray's dissent that it is necessary to review the constitutional language in determining the test for constitutionality. However, the choice of test is also influenced by the fact the right to make health care decisions is fundamental, a conclusion which is unanimous among the members of the Court. *See* J. Fenn, specially concurring op., ¶ 114; J. Gray, dissenting op., ¶ 134, and precedent recognizing that statutes which impact express fundamental rights are often subject to strict scrutiny. *See e.g., Mills,* 837 P.2d at 53; *Campbell Cnty. Sch. Dist.,* 907 P.2d at 1266–67.

*County, supra,* indicate the Abortion Laws, which restrict the fundamental right to make health care decisions, should be subject to strict scrutiny.

[¶57] Next, we consider whether the specific language of the constitutional provision comports with that exacting analysis or suggests otherwise. For the reasons explained below, we conclude it supports our application of the strict scrutiny standard.

[¶58] Article 1, § 38(a) grants each competent adult "the right to make his or her own health care decisions." Subsection (c) states the "legislature may determine reasonable and necessary restrictions on the rights granted under this section to protect the health and general welfare of the people or to accomplish the other purposes set forth in the Wyoming Constitution." Subsection (d) requires the State of Wyoming to preserve the rights guaranteed in Article 1, § 38 "from undue governmental infringement."

[¶59] When Article 1, § 38 was adopted in 2012 the plain meaning of "reasonable" in subsection (c) was understood as "being in accordance with reason," "moderate, fair" and "not extreme or excessive." *Reasonable*, Merriam-Webster, https:// web.archive.org/ web/20120117221139/https://www.merriam-webster.com/ dictionary/reasonable (last visited Jan. 5, 2026). "Necessary" meant "absolutely needed: required." *Necessary*, Merriam-Webster, https://web.archive.org/web/20120119063244/https://www.merriam-webster.com/dictionary/necessary (last visited Jan. 5, 2026). Because the terms "reasonable" and "necessary" are connected by "and," ***both*** conditions must be satisfied. *Prickett v. Prickett,* 2007 WY 153, ¶ 11, 167 P.3d 661, 664 (Wyo. 2007) (the word "and" is interpreted in statutes as conjunctive) (citing *Clark v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 968 P.2d 436, 438 (Wyo. 1998) and Webster's New Collegiate Dictionary 43 (1977)). Therefore, to justify infringement on the fundamental right under Article 1, § 38, any regulation restricting a woman's right to make her own health care decisions (including abortion decisions) must be "moderate, fair," "not extreme or excessive," ***and*** "absolutely needed" "to protect the health and general welfare of the people or to accomplish the other purposes set forth in the Wyoming Constitution." Wyo. Const. art. 1, § 38(c). It is not enough for a restriction on a woman's fundamental right to make health care decisions to be reasonable (moderate, fair, not extreme or excessive)—it also must be necessary (absolutely needed). To fail to give effect to both requirements would be to disregard the plain language of Article 1, § 38 and neuter any meaningful opportunity to protect that fundamental right.

[¶60] Subsection (d) of Article 1, § 38 emphasizes the governmental limitation on restricting the constitutional right to make personal health care decisions by requiring the State (which includes the Court) to protect the right against "undue governmental

23

infringement."[11] In 2012 "undue" meant "excessive." *Undue* Merriam-Webster, http:// web .archive.org/web/20120125174602/ https://www.merriam-webster.com/ dictionary/undue (last visited Jan. 5, 2026)

[¶61] These constitutional terms are easily harmonized with the strict scrutiny standard. Under strict scrutiny, the State must first show the statutory restriction on a woman's fundamental right to make her own health care decisions is necessary to achieve a compelling state interest. This comports with the language of subsection (c), which requires the restriction to be necessary/absolutely needed to protect the health and welfare of Wyoming citizens. The second part of the strict scrutiny test requires the State to show the restriction provides the least onerous/restrictive means of furthering the compelling interest or, in other words, the restriction is narrowly tailored to achieve the interest. Subsection (c)'s requirements that the regulation be reasonable (not extreme or excessive) and necessary (absolutely needed) and subsection (d)'s requirement that the State's action not unduly (excessively) infringe on the constitutional right to make health care decisions fit seamlessly into the second element of the strict scrutiny test. The statutory means of furthering the compelling state interest must be the least restrictive or onerous, i.e., may not unduly/excessively infringe, on the fundamental right. Subsection (d) also clearly places the burden on the State to show any statutory restriction does not unduly interfere with the fundamental right to make health care decisions.

[¶62] Nevertheless, the State argues Article 1, § 38(c) departs from traditional constitutional standards. It claims subsection (c) impliedly abrogated our long-standing application of the strict scrutiny standard to fundamental rights when it specified "[t]he legislature may determine reasonable and necessary restrictions on the rights granted under this section to protect the health and general welfare of the people or to accomplish the other purposes set forth in the Wyoming Constitution." No part of Article 1, § 38 expresses an intention to abrogate our long-standing means for testing the constitutionality of statutes or to disallow use of the strict scrutiny standard to protect the fundamental right granted therein. This is particularly poignant given the legislature knew, when proposing the language of Article 1, § 38 to the people: 1) it was creating a new constitutional right, 2) separation of powers principles assign courts the duty to determine the applicable standard to test the constitutionality of statutes, 3) courts routinely apply strict scrutiny to statutes restricting fundamental rights, and 4) the plain language of Article 1, § 38, including the terms "necessary" and "undue governmental infringement," would signal a heightened level of scrutiny. *See e.g., Gordon,* 2018 WY 32, ¶ 55, 413 P.3d at 1109 (under separation

---

[11] We align fully with Paragraph 114, footnote 17 of Justice Fenn's special concurrence. As the special concurrence aptly recognizes, subsection (d) clearly requires all three branches of Wyoming government to protect against any undue infringement on the right guaranteed in Article 1, § 38. Moreover, it places the burden squarely on the State (executive branch) to justify any such infringement. Justice Gray's dissent fails to recognize the State's express responsibility to establish the reasonableness *and* necessity of any restriction on the right or even the importance of the Court making the foundational decision of which party bears the burden in a constitutional challenge. *See* J. Gray, dissenting op., ¶ 142, n.19.

of powers principles, courts have authority to determine the constitutional validity of statutes); Article 2, § 1 (the powers of the government are divided between the three branches); *Campbell Cnty. Sch. Dist. v. State,* 2008 WY 2, ¶ 11, 181 P.3d 43, 49 (Wyo. 2008) (strict scrutiny applied to statutes affecting fundamental right to education); *Mills,* 837 P.2d at 54 (strict scrutiny applied to statutes infringing on fundamental right to access to courts); *DiFelici v. City of Lander,* 2013 WY 141, ¶ 44, 312 P.3d 816, 827 (Wyo. 2013) ("We presume the legislature to act with full knowledge of the law[.]").[12]

[¶63] Although the State asserts at one point in its brief that Article 1, § 38(c) also abrogated the rational basis test, it subsequently embraces that test, stating the requirement that the statute be rationally related to a legitimate state objective is the "functional equivalent[]" of the "reasonable and necessary" test in Article 1, § 38(c). In accordance with limited review under the rational basis test, the State urges us to defer to the legislature's determination of what restrictions are reasonable and necessary.

[¶64] There are several problems with the State's argument that the rational basis standard applies. Initially, it relies upon the conclusion that the right to make health care decisions in Article 1, § 38 is an ordinary right. When ordinary rights are implicated, the legislature has discretion in exercising its police power and statutes passed under such authority are

---

[12] As the State and Justices Fenn and Gray point out, medical and health care is highly regulated in Wyoming, which means there are many statutes subject to Article 1, § 38's protection of an individual's right to make his or her own health care decisions. J. Fenn, specially concurring op. ¶¶ 118–20; J. Gray, dissenting op., ¶ 144 n.21. In fact, much of Title 35 of the Wyoming Statutes is devoted to laws pertaining to health care, including abortion. However, speculating whether other health care laws might be on "constitutional life support" when determining the constitutional test for reviewing whether any particular statute might violate Article. 1, § 38 is entirely inconsistent with this Court's precedent. J. Gray, dissenting op., ¶ 144, n.21.

There is no authority indicating the extent to which a new constitutional right might impact existing statutes is relevant in determining the nature of that right or the level of scrutiny applied to any statute infringing on the right. Considering the possible scope of constitutional challenges in determining how those challenges will be addressed, would undermine the constitutional protection. While an increase in litigation on the constitutionality of health care statutes may be an unintended consequence of the adoption of Article 1, § 38, that possibility does not change the nature of the right created in the provision. Under separation of powers principles, we do not adjust the level of constitutional scrutiny for a statute impacting a fundamental right simply because a heightened level of scrutiny could result in increased or more challenging litigation. This is not an absurd result; rather, it is a disciplined application of long-standing constitutional law.

It should come as no surprise that one of the consequences of amending the constitution to create a new individual right will be additional legal challenges. This is a reason amendment of the constitution should be pursued with caution and sufficient forethought. "[I]t is almost universally true that the procedures instituted for the amendment of constitutions have purposely been made cumbersome, in order that the organic law may not readily be remolded to fit situations and sentiments that are relatively transitory and fleeting." *Geringer v. Bebout,* 10 P.3d 514, 522 (Wyo. 2000) (citing 16 Am.Jur.2d, *Constitutional Law* § 22 (1998)). Regardless, the 2012 amendment to the constitution is now enshrined in Article 1, § 38, and the Court has the duty to protect that right as any other provision of the constitution.

subject to the more limited rational basis judicial review. *Greenwalt v. Ram Restaurant Corp.,* 2003 WY 77, ¶ 39, 71 P.3d 717, 729–31 (Wyo. 2003) (discussing rational basis review). However, as we have already stated, Article 1, § 38 grants a fundamental right, not an ordinary right.

[¶65] The State's argument in favor of rational basis review also does not give effect to the requirement in Article 1, § 38(c) that any restriction on the right to make health care decisions must be "necessary;" i.e., is absolutely needed. Under rational basis review, the statute is constitutional as long as it is "rationally related to a legitimate governmental interest." *Martin,* 2022 WY 21, ¶ 31, 503 P.3d at 78. We rephrased the rational basis test in *Martin* as requiring the challenged law be "'rationally related to the achievement of an *appropriate* legislative purpose.'" 2022 WY 21, ¶ 33, 503 P.3d at 78 (quoting *Greenwalt,* 2003 WY 77, ¶ 40, 71 P.3d at 732) (emphasis added). The search for an appropriate or legitimate governmental interest is much different from the requirement in subsection (c) that the restriction be both reasonable and necessary/absolutely needed. Finally, the rational basis test does not comply with Article 1, § 38(d)'s requirement that the State bears the burden of protecting the right against undue infringement. To the contrary, the party challenging a statute under the rational basis test has the burden of proving the statute is unconstitutional beyond a reasonable doubt. *Martin,* 2022 WY 21, ¶ 31, 503 P.3d at 78; *Greenwalt,* 2003 WY 77, ¶ 39, 71 P.3d at 730.

[¶66] The State cites several cases in support of its arguments that the rational basis test should apply to the Abortion Laws and the courts should defer to the legislature's decisions on how to regulate abortion—*Zancanelli v. Central Coal & Coke Co.,* 25 Wyo. 511, 173 P. 981 (Wyo. 1918), *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), *Doe v. Burk,* 513 P.2d 643 (Wyo. 1973), and *Cheaney v. State,* 285 N.E.2d 265 (Ind. 1972). None of these cases establish the Court is required to apply the rational basis standard when statutes impact a fundamental constitutional right or that we should simply defer to the legislature when it passes laws regulating a fundamental constitutional right. Nor do they provide any insight into the meaning of "necessary" or "undue governmental infringement" as used in Article 1, § 38(c) & (d).

[¶67] The State cites *Zancanelli* for its statements that the legislative branch has discretion to regulate matters of general public importance and statutes passed under that authority should be tested for reasonableness under the rational basis standard. We agree with those general principles because *Zancanelli* addressed ordinary rights; however, they do not apply in determining the constitutional test for statutes that impact a fundamental right like we have in this case. *Zancanelli,* 173 P. at 984–85 (the legislature reasonably used its police powers to enact workers' compensation statutes that did not impact any fundamental constitutional right).

[¶68] The State directs us to *Doe,* 513 P.2d 643, *Harris,* 448 U.S. 297, and *Cheaney,* 285 N.E.2d 265, as authority for its claim the Court should defer to the legislature's decisions

on abortion. Each of these cases is distinguishable from the case at bar. The State points out we said in *Doe* that regulation of abortion in Wyoming "is solely a matter for the legislature . . . ." 513 P.2d at 645. However, the State ignores the rest of the sentence, which said the legislature "must, of course, give heed to the pronouncements of the United States Supreme Court, particularly the summary appearing in *Roe v. Wade*[.]" *Id.* (citing *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.E.2d 147 (1973), *overruled by Dobbs,* 597 U.S. 215, 142 S.Ct. 2228). Currently, we review the legislature's right to regulate abortion through the lens of the fundamental right to make personal health care decisions guaranteed in Article 1, § 38.

[¶69] *Harris,* 448 U.S. at 312–18, 100 S.Ct. at 2685–89, is inapposite because the statutes at issue (the Hyde Amendment) did not impact a fundamental right. The United States Supreme Court ruled the Hyde Amendment, which prohibited federal funding of abortions, did not restrict the fundamental right to obtain an abortion as recognized in *Roe v. Wade,* and there was no corresponding right to governmental financing for the procedure. 448 U.S. at 312–18, 100 S.Ct. at 2685–89. The Court emphasized that, because the amendment did not affect a protected constitutional right, the independent appraisal of competing interests was entrusted to the legislature, not the courts. *Id.* at 326. In the absence of a fundamental right, the Supreme Court simply required the amendment to bear a rational relationship to a legitimate governmental interest. *Id.*

[¶70] *Cheaney*, too, is unpersuasive. In that case, the Indiana Supreme Court considered the constitutionality of a statute regulating abortion. *Cheaney,* 285 N.E.2d at 266. The court recognized women had a fundamental right to privacy implied in the United States Constitution, indicated the strict scrutiny test applied, and concluded the state had a compelling interest in protecting unborn children. *Id.* at 267–70. However, it did not appropriately apply the strict scrutiny test because, instead of determining if the statutes were narrowly tailored to advance the compelling interest, the court ruled the legislature had the right to balance the interests of unborn children and pregnant women without oversight by the judiciary. *Id.* at 269.

[¶71] None of the authorities cited by the State support conclusions that Article 1, § 38(c) abrogated the strict scrutiny test or that the rational basis test applies when a fundamental right is at issue. They also do not convince us to abdicate our constitutional authority and simply defer to the legislature's determinations that the Abortion Laws are reasonable and necessary and do not unduly infringe upon the constitutional right.

[¶72] Under our long-standing precedent, we consider both the nature of the constitutional right and the plain language of the constitutional provision to determine the correct standard for reviewing the constitutionality of Article 1, § 38. Given Article 1, § 38(a) confers a fundamental right and the plain language of § 38(c) & (d) embodies strict scrutiny principles, we will apply that test to determine whether the Abortion Laws unduly infringe on women's fundamental right to make health care decisions. Applying strict scrutiny, the

Abortion Laws' restrictions on a woman's right to make her own health care decisions will be "reasonable and necessary," as those terms are used in Article 1, § 38(c), if the State establishes they do not unduly infringe on the constitutional right because they are narrowly tailored to achieve a compelling government interest. Wyo. Const. art. 1, § 38(c) & (d).

## V.    Strict Scrutiny Analysis – The State has not met its burden of showing the Abortion Laws are narrowly tailored to serve a compelling government interest. The laws are therefore unconstitutional under Article 1, § 38.

[¶73] The questions presented in our strict scrutiny analysis of the Abortion Laws include: 1) whether the State has a compelling interest in restricting a woman's fundamental right to make her own health care decision to have an abortion; 2) whether the restrictions actually accomplish the compelling state objective; and 3) whether the statutes' methods of accomplishing the objective are least restrictive on the constitutional right. *Ailport v. Ailport,* 2022 WY 43, ¶ 27, 507 P.3d 427, 438 (Wyo. 2022); *see also Mills,* 837 P.2d at 54 (the State "must demonstrate 'a compelling interest . . . which is served by the challenged legislation and which cannot be satisfied by any other convenient legal structure.'") (quoting *Washakie Cnty. Sch. Dist. No. One*, 606 P.2d at 335).

[¶74] While our ultimate decision on whether the State has met its burden under the strict scrutiny standard is a matter of law, that decision is made on a given set of legislative/constitutional facts. *United States v. Friday,* 525 F.3d 938, 949 (10th Cir. 2008). The State has the burden of presenting evidence to answer each question of the strict scrutiny analysis. *See Campbell Cnty. Sch. Dist.,* 907 P.2d at 1266 (applying the strict scrutiny standard to school finance laws, the State had the burden of proof and its reliance on "generalizations" rather than specific evidence to justify the costs represented in the laws was insufficient to withstand constitutional muster); *United States v. Playboy Ent. Grp., Inc.,* 529 U.S. 803, 816–23, 120 S.Ct. 1878, 1888–92 (2000) (discussing the government's burden of proof and evidence of least restrictive means in applying strict scrutiny to content-based regulation of speech); *Shaw v. Hunt,* 517 U.S. 899, 908–18, 116 S.Ct. 1894, 1902–07, 135 L.Ed.2d 207 (1996) (discussing evidence in determining whether the government proved it had a compelling interest to use race-based considerations in drawing voting district and its means were narrowly tailored to achieve the compelling interest).

[¶75] The State did not present any evidence to justify the Abortion Laws' restrictions on the fundamental right to make health care decisions. It, instead, focused its efforts on arguing abortion is not health care, the decision to have an abortion is not the woman's own health care decision, Article 1, § 38 does not confer a fundamental right, and strict scrutiny does not apply. We have rejected the State's argument on each of those issues. As we will explain in detail below, the State's failure to present evidence to meet its burden of proving the Abortion Laws' restrictions on a woman's right to make her own health care decisions are narrowly tailored to serve a compelling state interest is dispositive.

## A.     Restrictions

[¶76] To perform a strict scrutiny analysis, we must understand the restrictions imposed by the Abortion Laws on a woman's right to make her own health care decisions. As stated earlier, people have the fundamental right to make their own health care decisions, and a woman's decision to have an abortion is a health care decision. The Abortion Laws restrict a woman's right to make her own health care decisions by mostly prohibiting physicians from providing abortions.

[¶77] The Life Act generally bans both procedural and medication abortions. Wyo. Stat. Ann. § 35-6-123. "Abortion" is defined generally in § 35-6-122(a)(i) as "the act of using or prescribing any instrument, medicine, drug or any other substance, device or means with the intent to terminate the clinically diagnosable pregnancy of a woman, including the elimination of one (1) or more unborn babies in a multifetal pregnancy, with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn baby." The provision excludes from the definition of "abortion" (and, therefore, the prohibition on abortion) "any use, prescription or means specified in this paragraph if the use, prescription or means are done with the intent to:"

> (A) Save the life or preserve the health of the unborn baby;
>
> (B) Remove a dead unborn baby caused by spontaneous abortion or intrauterine fetal demise;
>
> (C) Treat a woman for an ectopic pregnancy; or
>
> (D) Treat a woman for cancer or another disease that requires medical treatment which treatment may be fatal or harmful to the unborn baby.

*Id.*

[¶78] Section § 35-6-124 allows licensed physicians to perform abortions in limited circumstances:

> (a) It shall not be a violation of W.S. 35-6-123 for a licensed physician to:
>
> > (i) Perform a pre-viability separation procedure necessary in the physician's reasonable medical judgment to prevent the death of the pregnant woman, a substantial risk of death for the pregnant woman because of a physical condition

29

or the serious and permanent impairment of a life-sustaining organ of a pregnant woman, provided that no separation procedure shall be deemed necessary under this paragraph unless the physician makes all reasonable medical efforts under the circumstances to preserve both the life of the pregnant woman and the life of the unborn baby in a manner consistent with reasonable medical judgment;

(ii) Provide medical treatment to a pregnant woman that results in the accidental or unintentional injury to, or the death of, an unborn baby;

(iii) Perform an abortion on a woman when the pregnancy is the result of incest as defined by W.S. 6-4-402 or sexual assault as defined by W.S. 6-2-301. Prior to the performance of any abortion under this paragraph the woman, or the woman's parent or guardian if the woman is a minor or subject to a guardianship, shall report the act of incest or sexual assault to a law enforcement agency and a copy of the report shall be provided to the physician; or

(iv) Perform an abortion on a woman when in the physician's reasonable medical judgment, there is a substantial likelihood that the unborn baby has a lethal fetal anomaly or the pregnancy is determined to be a molar pregnancy.

[¶79] The Medication Ban in Wyo. Stat. Ann. § 35-6-139 supplements the general ban on abortion in the Life Act. Section 35-6-139 states in relevant part:

(a) Notwithstanding any other provision of law, it shall be unlawful to prescribe, dispense, distribute, sell or use any drug for the purpose of procuring or performing an abortion on any person.

(b) The prohibition in subsection (a) shall not apply to:

(i) The sale, use, prescription or administration of any contraceptive agent administered before conception or before pregnancy can be confirmed through conventional medical testing;

(ii) The treatment of a natural miscarriage according to currently accepted medical guidelines;

(iii) Treatment necessary to preserve the woman from an imminent peril that substantially endangers her life or health, according to appropriate medical judgment, or the pregnancy is the result of incest as defined by W.S. 6-4-402 or sexual assault as defined by W.S. 6-2-301. As used in this paragraph, "imminent peril" means only a physical condition and shall not include any psychological or emotional conditions. No medical treatment shall form the basis for an exception under this paragraph if it is based on a claim or diagnosis that the pregnant woman will engage in conduct which she intends to result in her death or other self-harm.

[¶80] A person who violates the Abortion Laws (other than the woman receiving the abortion) may be subject to loss of licensure and a felony charge, punishable by a $20,000 fine and up to five years imprisonment, or a misdemeanor charge, punishable by a $9,000 fine and up to six months imprisonment. Wyo. Stat. Ann. §§ 35-6-125(a)-(b), 35-6-126, 35-6-139(c)-(d).

## B. Compelling Interest

[¶81] The first requirement the State must meet in a strict scrutiny analysis is to show it has a compelling interest which justifies the statutory restrictions on the constitutional right. A compelling government interest "is one of the highest order." *Planned Parenthood of Montana*, 570 P.3d at 73; *see also Hodes & Nauser, MDs, P.A. v. Kobach*, 551 P.3d 37, 47 (Kan. 2024) (*Hodes & Nauser II*) ("The Supreme Court has described a compelling interest as one 'of the highest order.'") (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)). The State may not simply assert a compelling interest; it must substantiate that interest. *See Operation Save Am.*, 2012 WY 51, ¶ 78, 275 P.3d at 461 (finding no evidence in record to support asserted compelling interest in shielding children from psychological damage that injunction sought to protect against). To meet its burden, the State is required to present evidence/legislative facts showing its compelling interest. *See Hodes & Nauser II*, 551 P.3d at 51 ("We have made clear that in ascertaining whether an action directly promotes valid state interests[,] findings must be based on evidence, including medical evidence, presented in judicial proceedings.") (citation modified); *Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*, 948 P.2d 963, 971 (Alaska 1997) (quasi-public hospital failed to demonstrate a compelling interest to support its restrictions on access to abortion care where it had "not advanced any medical, safety, or other public-welfare interest to justify precluding elective abortions"). In keeping with the rule that the State may not simply declare an interest as compelling, it likewise may not create a compelling interest by simply adopting legislation. *Hodes & Nauser II*, 551 P.3d at 50. Instead, the State must specifically identify an "actual problem" that needs solving. *Operation Save Am.*, 2012 WY 51, ¶ 73, 275 P.3d at 459.

[¶82] The State asserts it has a compelling interest in preserving prenatal life at all stages of development,[13] and it contends that "only the State through its lawmaking authority can prevent the indiscriminate killing of many unborn babies caused by elective abortion." The State offers very little evidence or authority in support of this broad conclusory statement. That said, we need not decide in this case whether the State has a compelling interest in protecting unborn life from the moment of conception because even if we assume the State has such an interest, it has not met its burden of showing the Abortion Laws are narrowly tailored to serve that compelling interest.

## C.    Narrow Tailoring

[¶83] In determining if a statute satisfies the narrow tailoring requirement of strict scrutiny, courts consider whether the statute is necessary to protect the compelling state interest. The method or means of protecting the stated compelling interest must actually advance the compelling interest. *See Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.,* 600 U.S. 181, 215–17, 143 S.Ct. 2141, 2167–68, 216 L.Ed.2d 857 (2023) (the methods used by the university undermined, rather than promoted, its declared compelling interests); *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1214–15, 1245 (10th Cir. 2021) (to demonstrate narrow tailoring, "the government 'bears the burden of producing concrete evidence'—in 'some form'—'to show that its proposed restriction will actually achieve its asserted interest[.]'") (quoting *Martin v. City of Albuquerque,* 396 F. Supp. 3d 1008, 1031 (D.N.M. 2019)); *Am. Acad. of Pediatrics v. Lungren,* 940 P.2d 797, 828 (Cal. 1997) (statute did not further the compelling state interest).

[¶84]   As part of the narrow tailoring analysis, courts also consider whether a challenged statute is overinclusive or underinclusive. An overinclusive statute restricts conduct that does not further the compelling state interest. Richard H. Fallon, Jr., *Strict Judicial Scrutiny,* 54 UCLA L. Rev. 1267, 1328 (2007); *Hodes & Nauser II*, 551 P.3d at 49 (citing *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 362, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010) ("statute prohibiting corporations from funding speech supporting political candidates was overinclusive in relation to interest in preventing dissenting shareholders from being compelled to fund corporate speech because it applied to all corporations,

---

[13] The State also claims the Medication Ban "serves the compelling state interest in regulating the practice of medicine to protect the health and welfare of Wyoming citizens." It, however, provides no evidence showing its obvious interest in protecting the health and welfare of Wyoming citizens is served by banning the medications used to induce abortions.

In Wyo. Stat. Ann. § 35-6-121(a)(vi) (2025), the legislature identified as legitimate interests for the abortion restrictions "respect for and preservation of prenatal life at all stages of development; the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability." On appeal, the State does not advance these as compelling governmental interests, and we therefore do not address them.

including those with a single shareholder")). A statute is underinclusive if "it fails to regulate activities that pose substantially the same threats to the government's purportedly compelling interest as the conduct that the government prohibits." *Hodes*, 551 P.3d at 48 (quoting Fallon, Jr., *supra*, at 1327). An underinclusive statute "will predictably fail to achieve purportedly justifying goals." Fallon, Jr., *supra*, at 1327; *see also Hodes & Nauser II*, 551 P.3d at 51–52 (statute was underinclusive because it failed *"*to curtail activity that pose[d] the same threat to the State's asserted interest" as the restricted activity).

[¶85] The State contends the Abortion Laws are narrowly tailored to achieve its asserted compelling interest of protecting unborn life because the exceptions to the abortion bans "permit a pregnancy to be terminated or an abortion to be performed when the pregnancy conflicts with the constitutionally protected rights of the pregnant woman." That statement is conclusory and does not demonstrate the law is narrowly tailored to achieve the compelling interest of protecting the unborn without unduly infringing on the woman's right to make her own health care decision. Conclusory statements are insufficient to validate statutory restrictions under strict scrutiny. *See Does 1-11 v. Bd. Of Regents of Univ. of Colo.,* 100 F.4th 1251, 1273, 1278 (10th Cir. 2024) (the Tenth Circuit remarked the university did not even attempt to provide evidence showing its policies were narrowly tailored to achieve its asserted compelling interest and its explanation of narrow tailoring was "entirely conclusory.").

[¶86] The Plaintiffs, on the other hand, presented evidence showing the exceptions in the Abortion Laws are not narrowly tailored to protect unborn life without unduly infringing on a woman's fundamental right to make the health care decision to have an abortion. We will address a few examples.[14]

### 1. Exception for Lethal Fetal Anomaly

[¶87] The Life Act permits an abortion if, in "the physician's reasonable medical judgment, there is a substantial likelihood that the unborn baby has a lethal fetal anomaly." Wyo. Stat. Ann. §§ 35-6-124(a)(iv). "'Lethal fetal anomaly' means a fetal condition diagnosed before birth and if the pregnancy results in a live birth there is a substantial likelihood of death of the child within hours of the child's birth." Wyo. Stat. Ann. § 35-6-122(a)(vi). The Plaintiffs presented evidence showing physicians can know that certain anomalies are lethal, but they may not know whether a pregnancy will result in a live birth, and if so, whether it is substantially likely the child will die within hours or days.

---

[14] Our discussion of three examples of troublesome parts of the Abortion Laws does not necessarily represent all the potential constitutional problems with the Abortion Laws. We simply offer these as illustrations of strict scrutiny review. Our analysis would, of course, have been different if the State had provided evidence/legislative facts to justify the Abortion Laws.

[¶88] Dr. Anthony is a Wyoming physician who specializes in obstetrics and gynecology. She provides all forms of gynecologic and obstetric care, including medication abortions. Dr. Anthony is concerned the lethal fetal anomaly exception is not workable because, for some lethal fetal abnormalities, it is not medically possible to determine whether the fetus will survive until birth, or if it does, how long it will survive afterwards. Dr. Anthony also indicates the term "hours" used in the exception does not provide her "with the guidance . . . to determine whether an abortion will violate" the Abortion Laws. Because of the complexity of this type of medical decision-making and providers' exposure to criminal prosecution and loss of licensure, the exceptions create gray areas, uncertainty, and hesitation for providers. The statutory language, therefore, requires physicians to make potentially career- and life-altering decisions without sufficient guidance and their understandable reluctance to do so will interfere with women's fundamental right to make the health care decision to have an abortion, even when the exception for lethal fetal anomalies applies.

[¶89] The State bore the burden of showing the exception serves the compelling interest of protecting unborn life without unduly interfering with a pregnant woman's right to make the health care decision to have an abortion. It presented no evidence showing its interest in preserving unborn life is served by conditioning an abortion of a fetus with an unquestionably fatal condition on a physician's potentially impossible determination that it will die within "hours" of a live birth.

[¶90] The State also failed to show the lethal fetal anomaly exception is the least restrictive means of furthering its compelling interest. The evidence demonstrates the difficulties with applying the exception will likely result in pregnant women being required to carry pregnancies with lethal fetal anomalies to term. In this respect, the statute is overinclusive because it unduly restricts a woman's right to obtain an abortion even when it will not serve the State's interest in protecting unborn life.

[¶91] Moreover, the overly restrictive exception unnecessarily endangers the health and lives of pregnant woman. Earlier, we described Drs. Anthony and Hinkles' testimony about physical and mental health conditions that can be caused and exacerbated by pregnancy. Labor and childbirth also present risks that can be life-threatening. Addressing the lethal fetal anomaly exception, Dr. Anthony stated, "given that full-term pregnancy has real health risks, including the possibility of death of the mother, for the State to force a woman to carry . . . a baby [with a lethal fetal anomaly] to term is unethical, inhumane, and an infringement of bodily autonomy." The State did not present any evidence showing the physicians' concerns were invalid. In short, the State failed to show the lethal fetal anomaly exception serves the compelling state interest of protecting unborn life or is least restrictive on a woman's fundamental right to make her own health care decisions.

[¶92] *Okla. Call for Reproductive Justice v. Drummond,* 543 P.3d 110 (Okla. 2023), addressed a similar situation. The Oklahoma Supreme Court held the due process clauses

34

of the state's constitution provided a woman an inherent right to an abortion to preserve her life and held three laws limiting a woman's access to life-saving abortion care likely violated that constitutional right.[15] *Id.* at 115–16. The laws restricted the right to obtain a legal abortion by allowing only physicians board certified in obstetrics and gynecology to perform abortions, requiring physicians performing medication abortions to have privileges (or be associated with a physician with privileges) at a hospital near where the drug was administered, and requiring an ultrasound prior to the abortion. *Id.*

[¶93] The state claimed the provisions served the compelling state interest of protecting women's health, but it did not present evidence showing the restrictions actually protected women's health when an abortion was necessary to save a woman's life. *Id.* at 115–16. Instead, the laws unnecessarily burdened women's rights to obtain timely life-saving abortions. *Id*. at 116; *see also Students for Fair Admissions, Inc.,* 600 U.S. at 217, 143 S. Ct. at 2168 (ruling the college's practice of placing applicants into inadequate and inaccurate racial classifications for admission purposes undermined, rather than promoted, the university's stated compelling interest in promoting diversity in the student body).

[¶94] In Wyoming, the Life Act restricts a woman's fundamental right to make the health care decision to have an abortion. Like the statutes in *Okla. Call for Reproductive Justice,* the exception for lethal fetal anomalies in § 35-6-124(a)(iv) is not narrowly tailored to protect the State's asserted compelling interest without unduly infringing on the woman's constitutional right.

## 2. Exception to Protect Life of the Woman

[¶95] Both the Life Act and the Medication Ban conditionally allow abortions when a pregnant woman's life or health is endangered by the pregnancy. Wyo. Stat. Ann. § 35-6-124(a)(i) states in relevant part:

> (a) It shall not be a violation of W.S. 35-6-123 for a licensed physician to:
>
> (i) Perform a pre-viability separation procedure necessary in the physician's reasonable medical judgment to prevent the death of the pregnant woman, a substantial risk of death for the pregnant woman because of a physical condition or the serious and permanent impairment of a life-sustaining organ of a pregnant woman . . . .

---

[15] *Okla. Call for Reproductive Justice* was an appeal of a denial of a request for a temporary injunction. 543 P.3d at 113.

[¶96] Although § 35-6-124(a)(i) applies to both procedural and medication abortions, the legislature adopted different language in the Medication Ban. Section 35-6-139(b)(iii) allows use of abortion drugs for:

> (iii) [t]reatment necessary to preserve the woman from an imminent peril that substantially endangers her life or health, according to appropriate medical judgment . . . . As used in this paragraph, "imminent peril" means only a physical condition and shall not include any psychological or emotional conditions. No medical treatment shall form the basis for an exception under this paragraph if it is based on a claim or diagnosis that the pregnant woman will engage in conduct which she intends to result in her death or other self-harm.

[¶97] Aside from the potential problems with the different standards in §§ 35-6-124(a)(i) and 35-6-139(b)(iii) applying to medication abortions, we are concerned about the language that disallows an abortion if a woman's life or health is at risk because of a mental health condition or "based on a claim or diagnosis that the pregnant woman will engage in conduct which she intends to result in her death or other self-harm." Section 35-6-139(b)(iii). The Plaintiffs presented evidence showing pregnancy can induce or exacerbate mental health conditions. Citing data from the CDC, Plaintiffs' expert, Dr. Ghazaleh Kinney Moayedi, noted in her affidavit that mental health conditions are the leading cause of maternal death in the United States, with almost one-quarter of pregnancy-related deaths directly linked to mental health conditions.

[¶98] The State did not present evidence showing mental illness is not a real threat to pregnant women or a diagnosed mental health condition in a pregnant woman should be considered suspect. It is obvious that, if a pregnant woman dies from a mental health condition, the unborn child is very likely to die, too. In this respect, the State has not shown the express prohibition on the consideration of mental health conditions in § 35-6-139(b)(iii) will further the compelling state interest of protecting unborn life. Moreover, nothing in the record shows it is narrowly tailored to impose the least onerous restrictions on the woman's fundamental right to make her own health care decisions. In fact, the evidence demonstrates the Abortion Laws could place a woman with a diagnosed mental health condition in mortal peril by not allowing her to exercise her fundamental right to make her own health care decision to have an abortion. The State has not demonstrated the complete exclusion of mental health conditions in § 35-6-139(b)(iii) and the consequent threat to the health and life of pregnant women suffering from mental health conditions represents the least onerous method of serving the compelling state interest in protecting unborn life.

[¶99] We agree with the North Dakota Supreme Court's analysis in *Access Indep. Health Servs., Inc. v. Wrigley*, 16 N.W.3d 902, 915–16 (N.D. 2025) (*Access Indep. Health Servs.*

36

*Inc. I*). The court considered the state's motion for a stay pending appeal of the district court's order declaring unconstitutional a statute which allowed for "abortions performed to save a woman from serious injury and death," but criminalized "abortions performed to treat psychological disorders that will cause a woman to engage 'in conduct that will result in her death' or conduct that will result in 'substantial physical impairment of a major bodily function.'" *Id.* at 906, 916 (quoting N.D.C.C. § 12.1-19.1-01(5)).

[¶100] The court recognized a pregnant woman "has a fundamental right to obtain an abortion to preserve her life or her health," and ruled strict scrutiny applied to the statutory restriction of that right. *Id.* at 915 (quoting *Wrigley v. Romanick,* 988 N.W.2d 231, 245 (N.D. 2023)). In denying the state's motion for a stay, the court ruled:

> Under every other circumstance, the law allows abortions performed to save a woman from serious injury and death. N.D.C.C. § 12.1-19-03(1). The law's exception for injury and death caused by psychological maladies appears arbitrary. If the State's goal is to prevent unnecessary abortions and protect maternal health, this law does not appear narrowly tailored to achieve that aim within constitutional bounds. Therefore, the law is unlikely to survive strict scrutiny review because it criminalizes abortions necessary to prevent a woman from harming or killing herself.

*Access Indep. Health Servs., Inc. I,* 16 N.W.3d at 916.[16]

[¶101] Here, the State has not met its burden of proving the exception to the abortion ban which only allows an abortion when a woman has a physical condition that substantially endangers her life or health is narrowly tailored to protect unborn life.

### 3. Exception for Incest and Sexual Assault

[¶102] Another example of the State's failure to justify the Abortion Laws under strict scrutiny review is the exception from the abortion ban for pregnancies that result from incest or sexual assault. Wyo. Stat. Ann. § 35-6-124(a)(iii). That provision states the ban on abortion shall not apply to an abortion performed

---

[16] On the merits, the North Dakota Supreme Court recently upheld North Dakota's abortion legislation as constitutional. *Access Indep. Health Servs., Inc. v. Wrigley*, ___ N.W.3d ___, ___ (N.D. 2025) (*Access Indep. Health Servs. Inc. II*). Notably, however, a majority of the court would have held the legislation to be unconstitutional. North Dakota's constitution requires a supermajority of four members of the court in order to declare a legislative enactment unconstitutional. N.D. Const. art. VI, § 4. Thus by operation of the North Dakota Constitution, the abortion legislation in that state remains in effect.

on a woman when the pregnancy is the result of incest as defined by W.S. 6-4-402 or sexual assault as defined by W.S. 6-2-301. Prior to the performance of any abortion under this paragraph the woman, or the woman's parent or guardian if the woman is a minor or subject to a guardianship, shall report the act of incest or sexual assault to a law enforcement agency and a copy of the report shall be provided to the physician.

*Id.*

[¶103] The exemption, which allows an abortion simply because conception occurred as a result of incest or a sexual assault, does nothing to further the State's interest in protecting unborn children and the State does not advance any other compelling interest to justify the exception. *Brewer*, 18 F.4th at 1214–15, 1245 (the government must show the restriction will achieve its asserted compelling interest). In that regard, the Abortion Laws are underinclusive because they do not protect all unborn children. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 543–47, 113 S.Ct. 2217, 2232–34, 124 L.Ed.2d 472 (1993) (Ordinances prohibiting animal sacrifice during religious rites violated the church's right to the free exercise of religion because they were not narrowly drawn to promote the city's claimed interests of preventing public health risks and preventing cruelty to animals. The ordinances were underinclusive because other types of animal killing (e.g., slaughter for food and euthanasia) were permitted).

[¶104] Even if the State had identified another compelling interest which would be furthered by banning abortions in general but allowing an exception for pregnancies resulting from sexual assault or incest, the Plaintiffs raise concerns about the requirement in § 35-6-124(a)(iii) for the pregnant woman to report the attack that led to her pregnancy to law enforcement and provide a written copy of that report to the physician before an abortion may be performed. *Id*.

[¶105] Plaintiffs' prosecutorial expert, Michael A. Blonigen, stated sexual assault and incest are underreported crimes. He also expressed the following concerns regarding the impact of the reporting requirement:

> [T]he requirement of written reports is out of step with current police work. Currently, and has been the case for several years, written reports are often incomplete or insubstantial, and may not provide sufficient information to a health care provider. Rather reports are usually set forth in digital media such as video, audio recording, body cameras.
>
> These issues are nothing as compared to burdens placed on minor victims of sexual assault and abuse. To come within the exemption, the minor victim cannot even be the reporting

38

party. The report must be made by the minor's parents or guardian. Guardianship is a term defined by law. It does not encompass the vast array of people caring for children including but not limited to stepparents, grandparents, siblings, foster parents or state agencies such as the Department of Family Services. . . . There is no provision for the child to seek care through a court ordered attorney or physical custodian.

Based on my training and experience this language will result in the failure to provide abortion care to significant numbers of victims of childhood sexual abuse. The most obvious case is the case where the child's father has impregnated a child. It seems unlikely the perpetrator will report themselves and it is common for parents of sexual abuse victims to shelter others who may sexually abuse children. The number of cases where parents protect grandparents, uncles, boyfriends and family friends are too many to count. In addition, reporting the assault to the police in cases of pregnancy would probably result in the collection of irrefutable DNA evidence which would lead to the prosecution of the perpetrator. The reporting requirement creates the real possibility that a minor victim will have to carry a child to term that is the result of her being subjected to sexual assault.

[¶106] The State presented no evidence countering Mr. Blonigen's statements about the problems with obtaining an appropriate report in a timely fashion or demonstrating law enforcement reports are necessary because women commonly provide falsified claims of incest or assault to obtain abortions. Instead, the evidence shows this requirement, which is out of step with normal law enforcement procedure, will likely create a barrier that will prevent victims from accessing abortion care. *See Okla. Call for Reproductive Justice,* 543 P.3d at 115–16. The State has not shown that requiring a woman who has already been a victim of violence to follow a flawed process to obtain authorization for an abortion is the least restrictive alternative. Like the other exceptions we have discussed, the requirement unduly infringes on the woman's constitutional right.

[¶107] A woman has a fundamental right to make her own health care decisions, including the decision to have an abortion. The State did not meet its burden of demonstrating the Abortion Laws further the compelling interest of protecting unborn life without unduly infringing upon the woman's fundamental right to make her own health care decisions. As such, the Abortion Laws do not constitute reasonable and necessary restrictions on a pregnant woman's right to make her own health care decisions.

## *CONCLUSION*

[¶108] The State did not meet its burden of proving the Abortion Laws are necessary to achieve a compelling government interest or are narrowly tailored to avoid unduly infringing on a woman's right to make her own health care decisions under Article 1, § 38 of the Wyoming Constitution. Having concluded the Abortion Laws violate Article 1, § 38, we need not address Plaintiffs' claims that the laws are unconstitutionally vague, or that they violate the equal protection, substantive due process, and religious freedom and establishment provisions of the Wyoming Constitution.

[¶109] Affirmed.

**FENN, Justice**, specially concurring.

[¶110] I concur with the result reached by the majority. I agree with the majority the decision to terminate or continue a pregnancy is a woman's own health care decision. I also agree with the majority's departure from the distinction between facial and as-applied challenges. However, I cannot agree with the majority's conclusion that strict scrutiny applies to the right recognized in Article 1, § 38 of the Wyoming Constitution. I would find Article 1, § 38 allows the legislature to enact reasonable and necessary restrictions that do not unduly infringe on the right to make one's own health care decisions. Because the State failed to meet its burden of proving the Abortion Statutes meet this standard, I would find the statutes are unconstitutional and affirm the district court's decision.

### I. *The Plain, Unambiguous Language of Article 1, § 38 Requires the Application of a Constitutionally Defined Level of Scrutiny, Not Strict Scrutiny.*

[¶111] "Interpreting the constitution is exclusively the province of the courts. . . ." *Rodriguez-Williams v. Johnson*, 2024 WY 16, ¶ 29, 542 P.3d 632, 640 (Wyo. 2024). "The Wyoming Constitution is a fundamental law 'established by and expressing the will of the people.'" *Powers v. State*, 2014 WY 15, ¶ 73, 318 P.3d 300, 323 (Wyo. 2014) (citation omitted). This Court has the responsibility to "preserve, protect, and defend the people's fundamental law." *Id.* "Where a constitution asserts a certain right, or lays down a certain principle of law or procedure, it speaks for the entire people as their supreme law, and it is the paramount authority for all that is done in pursuance of its provisions." *Cathcart v. Meyer*, 2004 WY 49, ¶ 43, 88 P.3d 1050, 1067 (Wyo. 2004) (quoting 16 Am. Jur. 2d *Constitutional Law* § 1 (1998)). The "fundamental law" created by a constitution is "absolute and unalterable except through amendment by the people from which it emanated." *Id.* (quoting 16 Am. Jur. 2d *Constitutional Law* § 1). It is this Court's duty to ascertain the meaning of the Wyoming Constitution and the meaning of any statute passed by the legislature. *State v. Campbell Cnty. Sch. Dist.*, 2001 WY 90, ¶ 30, 32 P.3d 325, 332 (Wyo. 2001) (quoting The Federalist No. 78 (Alexander Hamilton)). The power of the people is superior to both the power of the judiciary and the power of the legislature. *Id.* at ¶¶ 30–31, 32 P.3d at 332. Where the will of the legislature as declared in its statutes is in opposition to that of the people as declared in the Constitution, courts are and must be governed by the will of the people and must regulate judicial decisions by the fundamental law found in the Constitution. *Id.*; *see also* Wyo. Const. art. 1, § 1 ("All power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety and happiness; for the advancement of these ends they have at all times an inalienable and indefeasible right to alter, reform or abolish the government in such manner as they may think proper."). This Court cannot ignore or disregard the mandates of the Wyoming Constitution. *See* 16 Am. Jur. 2d *Constitutional Law* § 61 (November 2025 Update).

41

[¶112] To decide if the Abortion Statutes are constitutional, this Court must interpret Article 1, § 38 to determine the extent to which this provision limits the legislature's power to regulate a competent adult's right to make his or her own health care decisions. Our rules of constitutional construction and interpretation are well known. "In cases of constitutional interpretation, '[w]e are guided primarily by the intent of the drafters.'" *Powers*, 2014 WY 15, ¶ 8, 318 P.3d at 303 (quoting *Cantrell v. Sweetwater Cnty. Sch. Dist. No. 2*, 2006 WY 57, ¶ 6, 133 P.3d 983, 985 (Wyo. 2006)).

> The primary principle underlying an interpretation of constitutions or statutes is that the intent is the vital part, and the essence of the law. The object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it. In the case of all written laws, it is the intent of the lawgiver that is to be enforced.

*Id.*, 318 P.3d at 303–04 (quoting *Rasmussen v. Baker,* 50 P. 819, 821 (1897)) (citation modified). To determine the intent of the people adopting a written constitution or amendment thereto, we look first at the plain and unambiguous language used in the text of the constitution. *Id.* at ¶¶ 8–9, 318 P.3d at 303–04. "If the language employed is plain and unambiguous, there is no room left for construction. It must be presumed that in [the] case of a constitution the people have intended whatever has been plainly expressed. Courts are not at liberty to depart from that meaning which is plainly declared." *Id.* at ¶ 8, 318 P.3d at 304 (quoting *Rasmussen*, 50 P. at 821).

> It is the duty and responsibility of the court to ascertain the meaning of the constitution as written, neither adding to nor subtracting from it, and neither deleting nor distorting the document. A court's obligation is to give to the words of a constitution a reasonable interpretation consistent with the plain meaning understood by the ratifiers.

16 Am. Jur. 2d *Constitutional Law* § 71 (November 2025 Update). We apply harmonizing rules like those employed in interpreting statutes, and we interpret the Wyoming Constitution in a manner that gives effect to every word, clause, and sentence, without rendering any portion meaningless. *Powers*, 2014 WY 15, ¶ 9, 318 P.3d at 304 (citations omitted). With these rules in mind, I turn to the constitutional provision at issue in this case.

[¶113] Article 1, § 38 of the Wyoming Constitution is different than all the other declarations of rights contained in Article 1 of the Wyoming Constitution. *See* Wyo. Const. art. 1, §§ 1–39. Whereas the other 38 rights set forth in Article 1 contain relatively short, simple statements, § 38 has four subsections, which under our harmonizing rules must be read together. Section 38 states:

**Sec. 38. Right of health care access.**

  (a) Each competent adult shall have the right to make his or her own health care decisions. The parent, guardian or legal representative of any other natural person shall have the right to make health care decisions for that person.

  (b) Any person may pay, and a health care provider may accept, direct payment for health care without imposition of penalties or fines for doing so.

  (c) The legislature may determine reasonable and necessary restrictions on the rights granted under this section to protect the health and general welfare of the people or to accomplish the other purposes set forth in the Wyoming Constitution.

  (d) The state of Wyoming shall act to preserve these rights from undue governmental infringement.

Neither party asserts Article 1, § 38 is ambiguous. I agree this provision is unambiguous and must be applied according to its plain terms.

[¶114] The plain language of subsection (a) recognizes a competent adult has the right to make his or her own health care decisions. Wyo. Const. art. 1, § 38(a). Subsection (b), which is not at issue in this appeal, recognizes a citizen's right to make direct payments to a health care provider without paying penalties or fines. Wyo. Const. art. 1, § 38(b). Subsection (c) contains language that expressly qualifies the right described in (a), and it specifically acknowledges the legislature may determine "reasonable and necessary restrictions" on "the rights granted under this section" for certain purposes, including to protect the health and general welfare of the people. Wyo. Const. art. 1, § 38(c). Subsection (d) imposes an affirmative obligation on the State to preserve the right to make health care decisions from "undue governmental infringement." Wyo. Const. art. 1, § 38(d). Because the language of Article 1, § 38 is plain and unambiguous, there is no room for construction, and we "are not at liberty to depart from that meaning which [has been] plainly declared." *Powers*, 2014 WY 15, ¶ 8, 318 P.3d at 304 (quoting *Rasmussen*, 50 P. at 821). Based on the plain language of Article 1, § 38, when determining whether a challenged statute that involves a health care decision is constitutional, courts must determine whether the statute is a "reasonable and necessary" restriction that does not unduly infringe upon a competent adult's right to make his or her own health care decisions.[17]

---

[17] The dissent suggests Article 1, § 38(d) applies only to governments other than the State, i.e. federal, tribal, county, and municipal governments. I cannot agree. Such an interpretation requires the Court to

[¶115] As the majority points out, this Court has traditionally applied either the rational basis test or the strict scrutiny test when determining the constitutional validity of statutes. However, we have left open the possibility there could be circumstances where some other level of scrutiny applies. *See White*, 784 P.2d at 1315–17 (discussing whether a citizen's right of access to the courts should be subject to a heightened level of scrutiny). The majority acknowledges there are instances where this Court does not apply strict scrutiny even when a statute purportedly impacts a "fundamental right," "because the express language of the constitution suggests a more appropriate test." Article 1, § 38 is unlike any other provision this Court has ever been asked to interpret, and it contains language specifically setting out the appropriate test that should be applied.

[¶116] The majority recognizes Article 1, § 38 is unique. The majority also concedes the plain meaning of this provision controls, and the Court is not at liberty to read restrictions into this provision. Despite these admissions and acknowledgements, the majority looks at the definitions of the words "reasonable," "necessary," and "undue" and determines these words are "easily harmonized with the strict scrutiny standard." Based on this harmonization, the majority concludes this Court must apply strict scrutiny to determine if the Abortion Statutes are constitutional under Article 1, § 38. Under the majority's interpretation, the legislature must have a compelling interest before it can regulate health care decisions, and each regulation must be narrowly tailored to achieve that interest. Such an interpretation ignores the language the people voted into the measure and replaces those words with others to shoehorn the unique right recognized in Article 1, § 38 into a judicially created standard that is contrary to the plain language of the constitutional provision. "We should decide constitutional issues based on the words used in the Wyoming Constitution, not in spite of them." *Powers*, 2014 WY 15, ¶ 82, 318 P.3d at 325 (Davis, J. concurring).

[¶117] Because the plain language of Article 1, § 38 sets forth the standard that should be applied to any statute that allegedly violates this constitutional provision, the Court does not need to apply any judicially created standard. This Court, like all other branches of the State government, is bound by the limitations expressed in the Wyoming Constitution. *See Campbell Cnty. Sch. Dist.*, 2001 WY 90, ¶¶ 30–31, 32 P.3d at 332 (stating courts are subject to the will of the people as expressed in the constitution); 16 C.J.S. *Constitutional Law* § 12

---

read words into Article 1, § 38(d) that are not there, which goes against our principles of constitutional interpretation and construction. *See Gordon*, 2018 WY 32, ¶ 39, 413 P.3d at 1105 ("We will not read words into the [constitutional] provision that the drafters omitted."). Section 38(d) imposes an affirmative duty on all three branches of the State government to "preserve these rights from undue governmental infringement." The language in (d) is not "superfluous," and reading this provision as applying to the State government would not produce a "borderline absurd" result. Any health care restrictions passed by the legislature must comply with the test set out in the constitutional provision. The executive branch bears the burden of proving any statutes challenged under this constitutional provision do not unduly infringe on the rights granted therein. The judicial branch must preserve the rights granted by this provision by holding the State to that burden when any health care statute is challenged.

(November 2025 Update) ("The constitution of a state is a limitation on the power of the legislature, binding on the several departments of state government, all its officers and agencies, the state's supreme court, and the people themselves."). The people, through the constitutional amendment process, can dictate this Court's standard of review. *See Rasmussen*, 50 P. at 822 (citation omitted) ("The sovereignty resides in the people, although, by written constitutions, they have delegated the exercise of sovereign powers to several departments. The people 'retain in their own hands a power to control the governments they create as far as they have thought needful to do so; and the three departments are responsible to and subject to be ordered, directed, changed, or abolished by them.'"); *Campbell Cnty. Sch. Dist.*, ¶¶ 30–31, 32 P.3d at 332 (stating courts must be governed by the will of the people, and they should regulate their decision by "the fundamental laws" of the constitution). Constitutional provisions cannot be abrogated, limited, or modified by this Court. *See* 16 C.J.S. *Constitutional Law* § 12. Our "jurisdiction [] extends only to the construction and enforcement of the constitution . . . ." *Grand Island & N. Wyo. R.R. Co. v. Baker*, 45 P. 494, 496 (Wyo. 1896); *see also Mack v. Johnson*, 27 S. W. 231, 232 (Ark. 1894) (citation modified) ("Courts must obey, not abrogate, constitutional provisions. . . . [W]here a constitution contains a positive provision, the courts cannot ignore it or annul it. . . ."); *Smith v. Craddick*, 471 S.W.2d 375, 379 (Tex. 1971) ("[T]his court may not abrogate any provision of the constitution for the sake of simplicity."). "If the people of the [State], by adopting a constitution, have committed themselves to a mistaken policy, the only remedy is an amendment, by constitutional methods, of that instrument." *Grand Island & N. Wyo. R.R. Co.*, 45 P. at 496. Accordingly, this Court must apply the standard of review adopted by the people in the Constitution rather than modifying the constitutional provision through the application of strict scrutiny.

[¶118] Contrary to the majority's assertion, I am not suggesting speculation about "the possible scope of [future] constitutional challenges" should dictate how this Court determines "how those challenges will be addressed." The majority misunderstands the reason why it is relevant to consider the number of statutes which may be subject to constitutional review following the issuance of this opinion when interpreting Article 1, § 38. The majority passes off a potential increase in litigation as merely "an unintended consequence" of the passage of this constitutional amendment. However, when interpreting Article 1, § 38, this Court must "give effect to the intent of the people" who adopted it. *Powers*, 2014 WY 15, ¶ 8, 318 P.3d at 304 (citation omitted). "Constitutional provisions, like legislative enactments, are presumed to be logical, reasonable, and just." *Cantrell*, 2006 WY 57, ¶ 11, 133 P.3d at 986 (citations omitted). As the majority points out, in some cases it is appropriate to use extrinsic aids of construction to confirm our interpretation of the plain, unambiguous language of a constitutional provision. *See Solvay Chems., Inc.*, 2022 WY 122, ¶ 25, 517 P.3d at 1131. Given the unique nature of this constitutional provision, I believe it is appropriate to use extrinsic aids of construction to confirm whether our proposed interpretation of the constitutional provision is correct.

45

[¶119] The Court can consider "the mischief the act was intended to cure, the historical setting surrounding its enactment, the public policy of the state, the conditions of the law and all other prior and contemporaneous facts and circumstances that would enable the court intelligently to determine the intention of the lawmaking body." *Cantrell*, 2006 WY 57, ¶ 6, 133 P.3d at 985 (citations omitted). At the time it was passed, Article 1, § 38 was considered a "message" amendment, "expressing the state's displeasure with the controversial federal Affordable Care Act . . . ." Keiter, *The Wyoming State Constitution* 110. After the Affordable Care Act was upheld, it became unclear what portions of Article 1, § 38 had been preempted by federal law and which remained viable. *See id.* When Article 1, § 38 was enacted, health care was heavily regulated by the State and the federal governments, and it remains so today. *See, e.g., Gonzales v. Carhart*, 550 U.S. 124, 157, 127 S. Ct. 1610, 1633, 167 L. Ed. 2d 480 (2007) (stating the government has "an interest in protecting the integrity and ethics of the medical profession," and plays a "significant role" in regulating the medical profession); *Taylor v. Wyo. Bd. of Med.*, 930 P.2d 973, 975 (Wyo. 1997) (recognizing the practice of medicine in the State of Wyoming is governed by the Medical Practice Act, Wyo. Stat. Ann. §§ 33-26-101 through 33-26-511, and by regulations "necessary to implement the Act" imposed by the Wyoming Board of Medicine); Wyo. Stat. Ann. §§ 35-1-101 to 35-13-206 (2025) (containing numerous statutes regulating public health and safety). When Article 1, § 38 was drafted and passed in 2012, the strict scrutiny standard existed. *See, e.g., Mills*, 837 P.2d at 54 (applying the strict scrutiny test in 1992). Yet, the drafters chose not to use the words "compelling interest" or "narrowly tailored" from the strict scrutiny standard when drafting Article 1, § 38. Instead, they specifically used the words "reasonable," "necessary" and "undue governmental infringement." *See* Wyo. Const. art. 1, § 38(c), (d). Therefore, these extrinsic aids of construction confirm that by passing Article 1, § 38, the drafters and ratifiers intended to create a unique right that would be subject to a different type of scrutiny than other rights set forth in the Wyoming Constitution.

[¶120] Article 1, § 38 recognizes the right of every competent adult to make his or her own health care decisions, not just the narrow right to make a decision concerning abortion care. Therefore, this Court is tasked with determining the test that applies when any statute that restricts a health care decision is challenged. If, as the majority suggests, strict scrutiny applies to every statute that implicates the rights guaranteed under Article 1, § 38, the State would have to have a "compelling interest" before it could pass a statute that impacted even the most mundane health care decision, and each statute would have to be "narrowly tailored in pursuit of that interest." The application of such a standard could lead to absurd results and completely undermine the legislature's ability to "enact laws for the health, safety, comfort, moral, and general welfare of the people," which "is an attribute of sovereignty [that] is essential for every civilized government . . . ." *State v. Langley*, 84 P.2d 767, 770 (Wyo. 1938); *see also* Wyo. Const. art. 10, § 2 ("The police power of the state is supreme over all corporations as well as individuals."). Constitutional provisions "should not be read so as to produce absurd results." *Cantrell*, 2006 WY 57, ¶ 11, 133 P.3d at 986–87 (citing *Corkill v. Knowles,* 955 P.2d 438, 445 (Wyo. 1998)). Article 1, § 38

46

expressly allows the legislature to "determine reasonable and necessary restrictions on the rights granted under this section . . . ." Wyo. Const. art. 1, § 38(c). "For us to hold otherwise would be tantamount to holding the constitution unconstitutional." *White*, 784 P.2d at 1317.

## II. The State Failed to Meet Its Burden of Proving the Abortion Statutes are Constitutional.

[¶121] Because we have never been called upon to interpret Article 1, § 38, this Court has never determined which party has the burden of proving the constitutionality of a statute challenged under this provision. In cases where the rational basis test applies, the heavy burden of proving a statute is unconstitutional falls on the challenger. *Hicks v. State*, 2025 WY 113, ¶ 83, 578 P.3d 366, 389 (Wyo. 2025). However, in cases where strict scrutiny or intermediate scrutiny applies, the burden falls on the government to justify the validity of the statute. *See Martin*, 2022 WY 21, ¶ 14, 503 P.3d at 73 (discussing the State's burden when strict scrutiny applies); *United States v. Skrmetti*, 605 U.S. 495, 510, 145 S. Ct. 1816, 1828–29, 222 L. Ed. 2d 136 (2025) (stating the intermediate scrutiny test places the burden on the State to show a gender classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives"). Article 1, § 38(d) places an affirmative obligation on the State to "preserve these rights from undue governmental infringement." Wyo. Const. art. 1, § 38(d). I would hold the test created by Article 1, § 38 places the burden of proof on the State to prove a statute passes constitutional muster.

[¶122] At the summary judgment stage, the State presented the following "evidence": a summary of the history of abortion laws in Wyoming from its territorial days through the enactment of the Abortion Statutes; a discussion of the legislative history of the Abortion Statutes; a discussion of the legislative history of Article 1, § 38; and newspaper articles and a "voter guide" that indicate Article 1, § 38 was passed in response to the Affordable Care Act. The State asserted the test announced in Article 1, § 38 was equivalent to a rational basis test. Therefore, the State argued under a rational basis type review, it did not need to present evidentiary proof to support the constitutionality of the Abortion Statutes, and facts such as those provided by the Appellees were not material or relevant to determining whether the statutes were constitutional under Article 1, § 38(c). The State asserted the constitutionality of the Abortion Statutes posed a purely legal question. The State argued the district court should afford great deference to the legislature's determination the Abortion Statutes were reasonable and necessary. Although the State asserted the Abortion Statutes struck a reasonable balance between the "legally protected rights of the pregnant woman" and "the legally protected rights of the unborn baby," none of the evidence presented by the State was directed at showing why the Abortion Statutes are reasonable and necessary restrictions that do not unduly infringe upon a competent woman's right to make her own health care decisions. Because the State presented no evidence making this showing, I would find the State failed to meet its burden of showing

47

the Abortion Statutes comply with Article 1, § 38, and the Abortion Statutes are unconstitutional. I would affirm the district court's decision on this basis.

**GRAY, Justice**, dissenting.

[¶123] I respectfully dissent. The Majority, like the district court, holds that the Life is a Human Right Act (Life Act), Wyo. Stat. Ann. §§ 35-6-120 through -138, and the Chemical Abortion statute, Wyo. Stat. Ann. § 35-6-139 (collectively abortion statutes), violate article 1, section 38 of the Wyoming Constitution, which gives each competent adult the right to make his or her own health care decisions. The Majority decides that a pregnant woman's decision to terminate or continue a pregnancy is her own health care decision, that the constitutional right to make one's own health care decisions under article 1, section 38 is a fundamental right, and any restriction on the right to make one's own health care decisions is subject to strict scrutiny. Applying strict scrutiny to the abortion statutes, the Majority assumes the State has a compelling interest in preserving prenatal life at all stages of development but concludes the State did not meet its burden of showing the abortion statutes are narrowly tailored to achieve that interest.

[¶124] The abortion statutes, in their application, may pose difficulties under constitutional provisions other than article 1, section 38, but the district court did not reach the plaintiffs' other constitutional arguments, and the statutes have yet to be applied to any of the plaintiffs. As a result, the only question before us is whether the abortion statutes violate article 1, section 38. I agree with the Majority that the decision to terminate or continue a pregnancy is a health care decision and that it is a woman's own health care decision under article 1, section 38. I also do not dispute that article 1, section 38 creates a fundamental right to make one's own health care decisions. I disagree, however, that strict scrutiny applies. Under the plain terms of article 1, section 38(c), a restriction on a competent adult's right to make his or her own health care decisions will pass constitutional muster if the legislature could "determine" such restriction was "reasonable and necessary . . . to protect the health and general welfare of the people or to accomplish the other purposes set forth in the Wyoming Constitution." When properly construed, the abortion statutes constitute a "reasonable and necessary" restriction by the legislature on the right of a pregnant woman to make her own health care decisions for the purpose of preserving prenatal life at all stages of development. The abortion statutes do not violate article 1, section 38.

## A.     Interpretation of Article 1, Section 38 and the Applicable Standard of Review

[¶125] Article 1, section 38 is unique to Wyoming's constitution and has not been previously interpreted. As the Majority correctly recognizes, the interpretation of article 1, section 38 does not turn on the nature of the statutes before us and is not limited to the question of abortion. The interpretation of article 1, section 38 will apply in other circumstances that might affect a competent adult's right to make "health care decisions," including questions ranging from assisted suicide to medical marijuana and vaccines.

49

[¶126] When interpreting the constitution, "[w]e are guided primarily by the intent of the drafters[.]" *Cantrell v. Sweetwater Cnty. Sch. Dist. No. 2*, 2006 WY 57, ¶ 6, 133 P.3d 983, 985 (Wyo. 2006) (citing *Cathcart v. Meyer*, 2004 WY 49, ¶ 39, 88 P.3d 1050, 1065 (Wyo. 2004)); *see also Rasmussen v. Baker*, 7 Wyo. 117, 50 P. 819, 822 (1897) ("The constitution derives its force from the people who adopted it, and it is the intention of the people which is to be sought for." (citation omitted)).

> In determining that intent, we look first to the plain and unambiguous language used in the text of the constitution. If the language is plain and unambiguous, there is no room left for construction.
>
> > It must be presumed that in [the] case of a constitution the people have intended whatever has been plainly expressed. Courts are not at liberty to depart from that meaning which is plainly declared.

*Gordon v. State by & through Capitol Bldg. Rehab.*, 2018 WY 32, ¶ 30, 413 P.3d 1093, 1103 (Wyo. 2018) (internal citations omitted) (quoting *Saunders v. Hornecker*, 2015 WY 34, ¶ 19, 344 P.3d 771, 777 (Wyo. 2015)).

> Further, in interpreting the plain and unambiguous language of the [c]onstitution, we follow harmonizing rules similar to those employed when interpreting statutes[:]
>
> > Our cases explain that every statement in the constitution must be interpreted in light of the entire document, rather than as a series of sequestered pronouncements, and that the constitution should not be interpreted to render any portion of it meaningless, with all portions of it read in pari materia and every word, clause and sentence considered so that no part will be inoperative or superfluous.

*Powers v. State*, 2014 WY 15, ¶ 9, 318 P.3d 300, 304 (Wyo. 2014) (quoting *Geringer v. Bebout*, 10 P.3d 514, 520 (Wyo. 2000)).

[¶127] Article 1, section 38 states:

> (a)    Each competent adult shall have the right to make his or her own health care decisions. The parent, guardian or legal

representative of any other natural person shall have the right to make health care decisions for that person.

(b)     Any person may pay, and a health care provider may accept, direct payment for health care without imposition of penalties or fines for doing so.

(c)     The legislature may determine reasonable and necessary restrictions on the rights granted under this section to protect the health and general welfare of the people or to accomplish the other purposes set forth in the Wyoming Constitution.

(d)     The state of Wyoming shall act to preserve these rights from undue governmental infringement.

Wyo. Const. art. 1, § 38.

[¶128] Subsection (a) and (b) outline certain rights.  Subsection (b) is not before us, as the plaintiffs did not allege the abortion statutes violate subsection (b).  Subsection (a) gives each competent adult the right to make his or her own health care decisions.  If the person is not a competent adult, the person's parent, guardian, or other legal representative shall have the right to make health care decisions for that person.  I agree with the Majority that the decision to terminate or continue a pregnancy is a "health care decision" and that it is a woman's own health care decision under article 1, section 38.

[¶129] The Majority decides the right of a competent adult to make one's own health care decisions is a fundamental right.  Because the right is explicitly guaranteed by our constitution, I do not dispute that the right to make one's own health care decisions under article 1, section 38 is a fundamental right.  *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973) ("[T]he key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing.  Nor is it to be found by weighing whether education is as important as the right to travel.  Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution."); *Mills v. Reynolds*, 837 P.2d 48, 53 (Wyo. 1992) ("A fundamental right is a right which the constitution explicitly or implicitly guarantees."). *But see Vaughn v. State*, 2017 WY 29, ¶¶ 27–28, 391 P.3d 1086, 1095–96 (Wyo. 2017) (in the due process context, "[f]undamental rights are those liberties that are objectively deeply rooted in this country's history and tradition").

[¶130] The Majority then determines that any restriction on the right of a competent adult to make one's own health care decisions is subject to strict scrutiny, which requires the

State to prove (1) the restriction is necessary to further a compelling state interest and (2) that interest cannot be served in a less onerous or restrictive manner or, stated differently, the restriction is narrowly tailored to achieve the compelling state interest. I disagree that strict scrutiny applies.

[¶131] It is a misconception that strict scrutiny applies whenever a fundamental right is involved. For example, the Fourth Amendment of the United States Constitution and article 1, section 4 of the Wyoming Constitution provide: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV; Wyo. Const., art. 1, § 4. Yet, neither the United States Supreme Court nor this Court applies strict scrutiny to determine the validity of a governmental search or seizure, but instead looks to whether the search or seizure was reasonable. *See Lange v. California*, 594 U.S. 295, 301, 141 S.Ct. 2011, 2017, 210 L.Ed.2d 486 (2021) ("As [its] text makes clear, 'the ultimate touchstone of the Fourth Amendment is "reasonableness."'" (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 1947, 164 L.Ed.2d 650 (2006))); *Boyer v. State*, 2025 WY 93, ¶ 12, 574 P.3d 161, 165 (Wyo. 2025) (stating "the standard governing our analysis under article 1, section 4 of the Wyoming Constitution is whether the traffic stop is 'reasonable under all of the circumstances'" (quoting *O'Boyle v. State*, 2005 WY 83, ¶¶ 30–31, 117 P.3d 401, 410 (Wyo. 2005))).

[¶132] Similarly, "the right to a speedy trial is a fundamental right guaranteed by the Sixth Amendment to the Constitution of the United States, and it applies to the states by virtue of the due process clause found in the Fourteenth Amendment." *Wehr v. State*, 841 P.2d 104, 111 (Wyo. 1992) (citing *Harvey v. State*, 774 P.2d 87, 91 (Wyo. 1989) (citing *Klopfer v. State of N.C.*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967))). *See also* Wyo. Const. art. 1, § 10 ("In all criminal prosecutions the accused shall have the right . . . to a speedy trial . . . ."). When determining whether an accused's right to a speedy trial was violated, we do not apply strict scrutiny. Instead, "we look to the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972): '(1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant.'" *Cotney v. State*, 2022 WY 17, ¶ 19, 503 P.3d 58, 66 (Wyo. 2022) (quoting *Crebs v. State*, 2020 WY 136, ¶ 14, 474 P.3d 1136, 1142 (Wyo. 2020)).

> We conduct this analysis to determine whether the delay in bringing the accused to trial was unreasonable, that is, whether it substantially impaired the right of the accused to a fair trial. No single factor is dispositive. Instead, we consider the factors together and balanced in relation to all relevant circumstances. The State has the burden to prove delays in bringing the defendant to trial are reasonable and necessary.

*Id.* (quoting *Fairbourn v. State*, 2020 WY 73, ¶ 42, 465 P.3d 413, 424–25 (Wyo. 2020)).

[¶133] Indeed, there are more fundamental rights not subject to strict scrutiny than those that are subject to strict scrutiny. As one commentator has aptly explained:

> Fundamental rights do not trigger strict scrutiny, at least not all of the time. In fact, strict scrutiny—a standard of review that asks if a challenged law is the least restrictive means of achieving compelling government objectives—is actually applied quite rarely in fundamental rights cases. Some fundamental rights trigger intermediate scrutiny, while others are protected only by reasonableness or rational basis review. Other fundamental rights are governed by categorical rules, with no formal "scrutiny" or standard of review whatsoever. In fact, only a small subset of fundamental rights triggers strict scrutiny—and even among those strict scrutiny is applied only occasionally. In short, the notion that government restrictions on fundamental rights are subject to strict scrutiny review is fundamentally wrong.

Adam Winkler, *Fundamentally Wrong About Fundamental Rights*, 23 Const. Commentary 227, 227–28 (2006).

[¶134] Because a fundamental right does not automatically invoke strict scrutiny, we must determine the standard of review triggered when a statute is challenged as a violation of the rights set forth in article 1, section 38. The answer is found in the plain language of the provision. Article 1, section 38(c) states:

> The legislature may determine reasonable and necessary restrictions on the rights granted under this section to protect the health and general welfare of the people or to accomplish the other purposes set forth in the Wyoming Constitution.

Reading article 1, section 38 as a whole, Wyoming voters placed the right of each competent adult to make his or her own health care decisions into the constitution, and they simultaneously allowed the legislature to "determine reasonable and necessary restrictions" on that right "to protect the health and general welfare of the people or to accomplish the other purposes set forth in the Wyoming Constitution." The standard of review established by the people in the constitution for legislative restrictions on health care decisions is whether the restrictions are "reasonable and necessary" to protect the health and general welfare of the people or to accomplish the other purposes set forth in the Wyoming Constitution. This standard, not strict scrutiny, applies.

53

[¶135] To decide what the drafters intended by subsection (c) and what the voters approved, "we attempt to understand the meaning of the words at the time [article 1, section 38] was ratified [in 2012]." *Gordon*, ¶ 31, 413 P.3d at 1103 (citing *Powers*, ¶ 36, 318 P.3d at 313). In 2012, the word "may" meant "have permission to . . . : be free to." *May*, Merriam-Webster's Collegiate Dictionary (11th ed., 2012). "Determine" was defined as "to fix conclusively or authoritatively" and "to settle or decide by choice of alternatives or possibilities" and "to bring about as a result: REGULATE." *Determine*, Merriam-Webster's, *supra*. "Reasonable" meant "being in accordance with reason," "not extreme or excessive" and "MODERATE, FAIR," while "necessary" was defined as "absolutely needed: REQUIRED." *Reasonable & Necessary*, Merriam-Webster's, *supra*. The word "and" is conjunctive and requires that both conditions—reasonable and necessary—be met. *Nunamaker v. State*, 2017 WY 100, ¶ 17, 401 P.3d 863, 868 (Wyo. 2017) (citing *Prickett v. Prickett*, 2007 WY 153, ¶ 11, 167 P.3d 661, 664 (Wyo. 2007)). "Restriction" meant "something that restricts: as . . . a regulation that restricts or restrains" and "restrain" meant "to prevent from doing, exhibiting, or expressing something" and to "limit, restrict, or keep under control." *Restriction & Restrain*, Merriam-Webster's, *supra*. "Accomplish" was defined as "to bring about (a result) by effort" and "to bring to completion: FULFILL."

[¶136] Subsection (c) is unambiguous. It gives the legislature the ability to place "reasonable and necessary" restraints on the right of competent adults to make their own health care decisions to either protect the safety and general welfare of the people of Wyoming or to fulfill other purposes set forth in the Wyoming Constitution. The plain meanings of the terms "reasonable" and "necessary" require any restriction or restraint on the right to be (1) in accordance with reason, not extreme or excessive, moderate, fair and (2) absolutely needed: required. *Reasonable & Necessary*, Merriam-Webster's, *supra*. We use a "reasonable and necessary" test to determine whether an accused's constitutional right to a speedy trial was violated, *Cotney*, ¶ 19, 503 P.3d at 66 (in speedy trial cases, "[t]he State has the burden to prove delays in bringing the defendant to trial are reasonable and necessary" (quoting *Fairbourn*, ¶ 42, 465 P.3d at 424–25)), and the United States Supreme Court applies it to decide whether a law impermissibly impairs a contract in violation of the Contracts Clause of the United States Constitution. *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 29, 97 S.Ct. 1505, 1521, 52 L.Ed.2d 92 (1977) (stating a state law which impairs a contract can only be sustained if it "was both reasonable and necessary to serve the admittedly important purposes claimed by the [s]tate"). These decisions, though arising in different contexts, are instructive with respect to the balancing of interests that determines whether legislation is "reasonable and necessary." As the Supreme Court stated in *U.S. Tr. Co. of New York*:

> Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption. As is customary in reviewing economic and social regulation, however, courts properly defer to legislative

> judgment as to the necessity and reasonableness of a particular
> measure.

*U.S. Tr. Co. of New York*, 431 U.S. at 22, 97 S.Ct. at 1518 (citations omitted). Deference to legislative judgment in this case is consistent with subsection (c) of article 1, section 38 which gives "[t]he *legislature* [the authority to] *determine* reasonable and necessary" restrictions on the right of competent adults to make their own health care decisions. Wyo. Const. art. 1, § 38(c) (emphasis added). Given that the legislature has the ability to "determine" reasonable and necessary restrictions—in other words, "to settle or decide by choice of alternatives or possibilities"—subsection (c) necessarily gives the legislature discretion in determining what is "reasonable and necessary." *Determine*, Merriam-Webster's, *supra*.

[¶137] The Majority recognizes "[t]here are instances . . . when we do not apply strict scrutiny to statutes which purportedly infringe on fundamental constitutional rights because the express language of the constitution suggests a more appropriate test." Nevertheless, relying on *Almada v. State*, 994 P.2d 299 (Wyo. 1999), *White v. State*, 784 P.2d 1313 (Wyo. 1989), and *Mills*, the Majority states "[o]ur precedent . . . teaches that courts determine the level of constitutional scrutiny by *considering the nature of the right guaranteed in the constitution <u>and</u> the express language of the constitutional provision*." (Emphasis added.)

[¶138] As explained above, a fundamental right does not, standing alone, trigger strict scrutiny. The language of the constitution can (and here does) provide the standard of review. *See, e.g.*, *Lange*, 594 U.S. at 301, 141 S.Ct. at 2017 ("As [its] text makes clear, 'the ultimate touchstone of the Fourth Amendment is "reasonableness."'" (quoting *Brigham City*, 547 U.S. at 403, 126 S.Ct. at 1947)). *See also* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."); *United States v. Bajakajian*, 524 U.S. 321, 326, 334, 118 S.Ct. 2028, 2032, 2036, 141 L.Ed.2d 314 (1998) (the Eighth Amendment prohibits the imposition of "excessive fines"; whether a fine is excessive turns on whether it is "grossly disproportionate to the [gravity of the] offense"); *Martinson v. State*, 2023 WY 88, ¶ 29, 534 P.3d 913, 921 (Wyo. 2023) ("the Wyoming Constitution's prohibition against cruel or unusual punishment prohibits punishment that is grossly disproportional to the gravity of the crime").

[¶139] The cases relied upon by the Majority are not to the contrary. *Almada* involved a right explicitly granted in the Wyoming Constitution—a fundamental right—yet we did not apply strict scrutiny. We applied the level of scrutiny/standard of review delineated in the constitutional provision. *Almada*, 994 P.2d at 308–10 (article 1, section 4 prohibits "unreasonable" searches and seizures). *Mills* and *White* addressed challenges to statutes as violative of equal protection and substantive due process. *Mills*, 837 P.2d at 49 (equal

55

protection); *White*, 784 P.2d at 1314 (equal protection and substantive due process). Because the equal protection and due process provisions of the Wyoming Constitution do not contain a level of scrutiny or standard of review, we look to the nature of the right to determine the level of scrutiny. *Mills*, 837 P.2d at 52–54; *White*, 784 P.2d at 1315–17. We are not applying the due process or equal protection provisions of the Wyoming Constitution here.

[¶140] The right at issue in *White* was article 1, section 8 of the Wyoming Constitution which states:

> All courts shall be open and every person for an injury done to person, reputation or property shall have justice administered without sale, denial or delay. Suits may be brought against the state in such manner and in such courts as the legislature may by law direct.

*White*, 784 P.2d at 1317 (emphasis omitted) (quoting Wyo. Const. art. 1, § 8). In addressing Mr. White's challenge, we recognized that "[w]e have long held the second sentence of [article 1, section 8] grants the legislature the power to determine the extent to which the State and its subdivisions are subject to suit." *Id.* (citing *Troyer v. Dep't of Health & Soc. Servs., Div. of Vocational Rehab.*, 722 P.2d 158, 162–63 (Wyo. 1986); *Worthington v. State*, 598 P.2d 796, 800–04 (Wyo. 1979); *Hjorth Royalty Co. v. Trs. of Univ. of Wyo.*, 30 Wyo. 309, 222 P. 9 (1924)). We held the power of the legislature to determine the extent to which the State and its subdivisions are subject to suit "was established as a *direct limitation on a right of the people, as declared in the first sentence of Article 1, § 8*."[18] *Id.* (emphasis added). The same can be said of article 1, section 38. Article 1, section 38(a) grants a right to the people but article 1, section 38(c) directly limits that right, making it subject to "reasonable and necessary" restrictions determined by the legislature.

[¶141] The Majority starts from a faulty premise—strict scrutiny applies because a fundamental right is involved. It then strains the conjunctive force of "reasonable and necessary" in subsection (c) and connects it with language addressing "undue

---

[18] We also found it

> noteworthy that the framers of the Wyoming Constitution did not include [the power of the legislature to determine the extent to which the State and its subdivisions are subject to suit] in Article 3 which generally sets out the powers, limitations on powers, and duties of the legislature. Rather, they chose to establish that power in the Declaration of Rights of Article 1.

*White*, 784 P.2d at 1317. The power of the legislature to determine "reasonable and necessary" restrictions on the right of competent adults to make their own health care decisions is similarly contained in the Declaration of Rights in article 1, not article 3.

56

governmental infringement" in subsection (d) to conclude challenges brought under article 1, section 38 are subject to strict scrutiny. It states:

> These constitutional terms are easily harmonized with the strict scrutiny standard. Under strict scrutiny, the State must first show the statutory restriction on a woman's fundamental right to make her own health care decisions is necessary to achieve a compelling state interest. This comports with the language of subsection (c), which requires the restriction to be necessary/absolutely needed to protect the health and welfare of Wyoming citizens. The second part of the strict scrutiny test requires the State to show the restriction provides the least onerous/restrictive means of furthering the compelling interest or, in other words, the restriction is narrowly tailored to achieve the interest. Subsection (c)'s requirements that the regulation be reasonable (not extreme or excessive) and necessary (absolutely needed) and subsection (d)'s requirement that the State's action not unduly (excessively) infringe on the constitutional right to make health care decisions fit seamlessly into the second element of the strict scrutiny test. The statutory means of furthering the compelling state interest must be the least restrictive or onerous, i.e., may not unduly/excessively infringe, on the fundamental right. Subsection (d) also clearly places the burden on the State to show any statutory restriction does not unduly interfere with the fundamental right to make health care decisions.

I am unable to join that conclusion.

[¶142] Taking the Majority's conclusion in reverse order, I first address subsection (d). I part company with the Majority's and the Concurring Opinion's reliance on subsection (d) to supply the standard of review. Subsection (d) directs the State of Wyoming to preserve the rights in subsections (a) and (b) "from undue governmental infringement." When the provision is read as a whole, the most coherent interpretation is that "governmental infringement" refers to action by governmental entities other than the State itself—most naturally the federal government, but also tribal, county, or municipal governments. Protection against overreach by our own state government is already structurally guaranteed by the Wyoming Constitution's separation of powers among the three branches: the legislature enacts legislation, the judiciary checks unconstitutional legislation, the executive may decline to enforce it, and every branch is independently bound by the Declaration of Rights. Wyo. Const., art. 2, § 1; art. 3, art. 4, art. 5; *see also* 16A Am. Jur. 2d *Constitutional Law*, § 235 (2025) ("The separation-of-powers principle distributes the

57

authority to make law to the legislature, the authority to execute law to the executive, and the authority to interpret law to the judiciary."). It would therefore be superfluous—and borderline absurd—to interpret subsection (d) as commanding the State (including the legislature) to protect citizens from the legislature's own enactments. *Cf. Seherr-Thoss v. Teton Cnty. Bd. of Cnty. Comm'rs*, 2014 WY 82, ¶ 19, 329 P.3d 936, 945 (Wyo. 2014) (we strive to avoid interpretations that yield absurd results). Because the statutes before us were enacted by the Wyoming Legislature, subsection (d) does not govern their validity or prescribe the standard of review we must apply.[19]

[¶143] Turning to subsection (c), the Majority correctly recognizes it allows the legislature to determine "reasonable and necessary" restrictions on the right of competent adults to make their own health care decisions, and both conditions—reasonable and necessary—must be satisfied. It decides both conditions "fit seamlessly" into strict scrutiny's demand that the restriction be the least onerous/restrictive means available (the second element of strict scrutiny). The plain meanings of the terms "reasonable" and "necessary" have no resemblance to the second element of the strict scrutiny test. To say otherwise ignores the word "reasonable" in subsection (c), which requires restrictions to be in accordance with reason, fair, moderate, and not extreme or excessive. This requirement is incompatible with the strict scrutiny's requirement that the restriction be the least onerous/restrictive means of achieving a compelling state interest or, stated differently, that the restriction be narrowly tailored to achieve that interest. While the Majority faults the State for relying on the rational basis test because that test does not give effect to the word "necessary" in article 1, section 38, the Majority's interpretation—that "reasonable and necessary" comports with the strict scrutiny test—focuses on the word "necessary" but fails to give

---

[19] The Majority and the Concurring Opinion also read subsection (d) as placing the burden of proof on the State to prove a statute passes constitutional muster under article 1, section 38. Nothing in subsection (d) speaks to the burden of proof. The Majority places the burden on the State because it concludes strict scrutiny applies. Strict scrutiny does not apply. Both the Majority and the Concurring Opinion recognize "the State" includes all three branches of state government but read "the State" as "the executive branch" for purposes of interpreting subsection (d) as assigning "the State" the burden of proof. Had the legislature intended subsection (d) to only apply to the executive branch, it would have said so as it did in subsection (c) when it referred only to "the legislature." *Cf. Leal v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2024 WY 86, ¶ 14, 553 P.3d 1181, 1186 (Wyo. 2024) ("We are guided by the full text of the statute, paying attention to its internal structure and the functional relation between the parts and the whole. Each word of a statute is to be afforded meaning, with none rendered superfluous. . . . We presume that the legislature acts intentionally when it uses particular language in one statute, but not in another." (quoting *Seherr-Thoss*, ¶¶ 19–20, 329 P.3d at 945)). The question of who has the burden of showing a statute is a reasonable and necessary restriction on the right of competent adults to make their own health care decisions is complicated and not clearly addressed in our precedent. I need not decide that issue here. As I will explain, the abortion statutes set forth the legislature's purposes for adopting them and the public record shows the number of abortions performed in the state each year. In this case, these matters, combined with the deference we owe the legislature under article 1, section 38(c), are sufficient to decide that the legislature could determine the abortion statutes are a reasonable and necessary restriction on a pregnant woman's right to make her own health care decisions to preserve prenatal life at all stages of development.

effect to the word "reasonable." Both are required, and to ignore either is contrary to our rules of constitutional interpretation. *Powers*, ¶ 9, 318 P.3d at 304 ("Our cases explain . . . that the constitution should not be interpreted to render any portion of it meaningless, with all portions of it read in pari materia and *every word, clause and sentence considered so that no part will be inoperative or superfluous*." (emphasis added) (quoting *Geringer*, 10 P.3d at 520)). Strict scrutiny also cannot be reconciled with subsection (c)'s deliberate grant of discretion to the legislature to "determine" reasonable and necessary restrictions on the right to make health care decisions. *Campbell Cnty. Sch. Dist. v. State*, 907 P.2d 1238, 1266 (Wyo. 1995), *as clarified on denial of reh'g* (Dec. 6, 1995) (recognizing that the presumption in favor of constitutional validity does not apply when applying strict scrutiny).

[¶144] According to the Majority:

> No part of [article] 1, [section] 38 expresses an intention to abrogate our long-standing means for testing the constitutionality of statutes or to disallow use of the strict scrutiny standard to protect the fundamental right granted therein. This is particularly poignant given the legislature knew, when proposing the language of [article] 1, [section] 38 to the people: 1) it was creating a new constitutional right, 2) separation of powers principles assign courts the duty to determine the applicable standard to test the constitutionality of statutes, 3) courts routinely apply strict scrutiny to statutes restricting fundamental rights, and 4) the plain language of [article] 1, [section] 38, including the terms "necessary" and "undue governmental infringement," would signal a heightened level of scrutiny.[20]

The Majority's analysis proceeds as if the voters were incapable of understanding the amendment they ratified—one that explicitly balances the fundamental right with "reasonable and necessary" restrictions determined by the legislature. It then addresses the amendment as if it was a statute and not a constitutional amendment. Article 1, section 38 was ratified by Wyoming voters. The people—not the legislature—determined the scope of protection their new right would receive. Although the legislature may not have the power by statute to abrogate our standard of review, the people, through the constitutional amendment process, do have that power:

> The sovereignty resides in the people, although, by written constitutions, they have delegated the exercise of sovereign

---

[20] The Majority again ignores the word "reasonable" in article 1, section 38(c).

powers to several departments.  The people "retain in their own hands a power to control the governments they create as far as they have thought needful to do so; and the three departments are responsible to and subject to be ordered, directed, changed, or abolished by them.  But this control and direction must be exercised in the legitimate mode previously agreed upon."

*Rasmussen*, 7 Wyo. 117, 50 P. at 822 (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union*, \*598 (4th ed. 1878)).  The people, through article 1, section 38(c), have dictated our standard of review.  By concluding subsection (c) "comports" with the strict scrutiny standard, the Majority not only deprives the word "reasonable" in subsection (c) of independent force but also displaces the people's deliberate choice of a more deferential, legislatively centered standard with a judicial test the voters did not adopt.[21]

---

[21] Although the practical consequences of a ruling are not dispositive in determining the appropriate level of scrutiny—or in disregarding an otherwise applicable constitutional standard—the Majority's acknowledgment that article 1, section 38 extends to the full scope of health care decision-making carries profound implications beyond the context of abortion.  The Majority's holding—that any restriction on the right of competent adults to make their own health care decisions is subject to strict scrutiny—logically extends far beyond abortion and places virtually the entire body of Wyoming health-care regulation in constitutional jeopardy.  *See Burson v. Freeman*, 504 U.S. 191, 200, 112 S.Ct. 1846, 1852, 119 L.Ed.2d 5 (1992) ("[W]e readily acknowledge that a law rarely survives such scrutiny[.]"); *Campbell Cnty. Sch. Dist.*, 907 P.2d at 1266 (recognizing that the presumption in favor of constitutional validity does not apply when applying strict scrutiny).  Among the ordinary, long-accepted regulations now presumptively unconstitutional (unless the State carries its heavy burden of proving the subject regulation is both necessary to achieve a compelling state interest and the least restrictive means of achieving that interest) are:

- mandatory vaccination or immunization requirements for school/daycare attendance (Wyo. Stat. Ann. §§ 14-4-116; 21-4-309; Wyo. Dep't of Health Admin. Rules, Mandatory Immunizations for Children Attending Schools and Child Caring Facilities, ch. 3);
- mandatory disease/infection reporting (smallpox, cholera, AIDS, syphilis, etc.) and contact-tracing/quarantine authority (Wyo. Stat. Ann. §§ 35-4-103, 35-4-104, 35-4-107, 35-4-108, 35-4-113, 35-4-130, 35-4-132, 35-4-133; Wyo. Dep't of Health Admin. Rules, Rules and Regulations for Reportable Diseases and Conditions, chs. 1, 11; Sexually Transmitted Diseases, chs. 1, 2);
- controlled substances prescribing limits and prohibitions, mandatory Prescription Drug Monitoring Program checks, and opioid quantity/duration caps (Wyo. Stat. Ann. §§ 33-21-302 (Advanced Practice Registered Nurse Compact) Article III(f)), 33-23-102, 33-24-136, 33-26-510(c), 35-7-1031, Board of Pharmacy Rules, Commissioner of Drugs & Substances Control, chs. 7, 8);
- substance abuse control plan for the prevention, early intervention, and treatment of alcohol and controlled substance abuse (Wyo. Stat. Ann. §§ 9-2-102(a), 9-2-2701; Wyo. Dep't of Health Admin. Rules, Mental Health and Substance Use Disorder Services, ch. 2);
- involuntary mental-health commitment and forced-treatment statutes for persons dangerous to self or others (Wyo. Stat. §§ 25-10-109 through -111);
- health care facility licensure requirements (Wyo. Stat. §§ 35-2-901 through -914);
- end-of-life treatment restrictions and Provider Orders for Life Sustaining Treatment Program Act (Wyo. Stat. Ann. §§ 35-22-501 through -509)[.]

[¶145] In sum, to pass constitutional muster under article 1, section 38, a restriction on the right to make health care decisions must be (1) in accordance with reason, moderate, fair, not extreme or excessive (reasonable) and (2) absolutely needed: required (necessary) for the protection of the people's health and general welfare or for the accomplishment of other purposes set forth in the Wyoming Constitution. By giving the legislature the power to "determine"—that is, to settle or decide by choice of alternatives or possibilities—what is reasonable and necessary, the people necessarily contemplated judicial deference to the legislature's judgment on both reasonableness and necessity. I now turn to the application of these principles to the abortion statutes.

## B.        Application of Article 1, Section 38 to the Abortion Statutes

[¶146] Applying strict scrutiny, the Majority determines the abortion statutes violate article 1, section 38. I disagree that the abortion statutes violate article 1, section 38. The abortion statutes constitute a "reasonable and necessary" restriction by the legislature on the right of a pregnant woman to make her own health care decisions for the purpose of preserving prenatal life at all stages of development.

[¶147] The abortion statutes contain the legislature's finding that an unborn baby is a member of the species homo sapiens from conception and therefore a member of the human race under article 1, section 2 of the Wyoming Constitution. Wyo. Stat. Ann. § 35-6-121(a)(i). *See also* Wyo. Const. art. 1, § 2 ("In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal."). One of the stated purposes of the abortion statutes is to respect and to preserve prenatal life at all stages of development. Wyo. Stat. Ann. § 35-6-121(a)(vi).

[¶148] To determine whether the abortion statutes constitute a "reasonable and necessary" restriction on a pregnant woman's right to make her own health care decisions to respect and to preserve prenatal life at all stages of development, we must first determine what restrictions the statutes impose on the right.

[¶149] When interpreting a statute, we apply the same rules we use to interpret the constitution. *Cantrell*, ¶ 6, 133 P.3d at 985. "[O]ur goal is to give effect to the intent of

---

These are not fringe or hypothetical laws; they are the core framework under which the practice of medicine and public health have operated in Wyoming for decades. Unless article 1, section 38 is amended or today's decision is overruled, virtually every health-care regulation in Wyoming is now on constitutional life support, inviting years of litigation, enormous defense costs, and profound uncertainty for providers, schools, employers, and public-health officials. This result is precisely what the voters avoided in 2012 when they empowered the legislature—not this Court—to "determine reasonable and necessary restrictions" on the rights they created.

the legislature, and we 'attempt to determine the legislature's intent based primarily on the plain and ordinary meaning of the words used in the statute.'" *PacifiCorp, Inc. v. Dep't of Revenue, State*, 2017 WY 106, ¶ 10, 401 P.3d 905, 908 (Wyo. 2017) (quoting *Fugle v. Sublette Cnty. Sch. Dist. No. 9*, 2015 WY 98, ¶ 8, 353 P.3d 732, 734 (Wyo. 2015) (quoting *Krenning v. Heart Mountain Irr. Dist.*, 2009 WY 11, ¶ 9, 200 P.3d 774, 778 (Wyo. 2009))). We also "construe each statutory provision *in pari materia*, giving effect to every word, clause, and sentence according to their arrangement and connection." *PacifiCorp*, ¶ 10, 401 P.3d at 908 (quoting *Nicodemus v. Lampert*, 2014 WY 135, ¶ 13, 336 P.3d 671, 674 (Wyo. 2014)).

[¶150] The Life Act prohibits a person from knowingly performing an abortion on a pregnant woman. Wyo. Stat. Ann. § 35-6-123. Any person (with the exception of the pregnant woman upon whom the abortion is performed) who violates § 35-6-123 is guilty of a felony. Wyo. Stat. Ann. § 35-6-125. In addition to this criminal penalty, the Life Act calls for the State Board of Medicine to immediately revoke, after due process, the license of "a physician or any other professionally licensed person who intentionally, knowingly or recklessly violates W.S. 35-6-123." Wyo. Stat. Ann. § 35-6-126(a) (LexisNexis 2025). "No civil penalty shall be assessed against a pregnant woman upon whom an abortion is performed or attempted for a violation of [the Life Act]." Wyo. Stat. Ann. § 35-6-126(b). The Life Act also allows a pregnant woman upon whom an abortion has been performed, induced, or coerced in violation of the Life Act to bring a civil action for damages against the violator and allows her, the district attorney, or the attorney general to seek injunctive relief against the violator. Wyo. Stat. Ann. § 35-6-127.

[¶151] While the Life Act prohibits a person from knowingly performing an abortion on a pregnant woman, it specifically excludes from the definition of abortion the termination of a pregnancy if the termination is done with the intent to (1) "[s]ave the life or preserve the health of the unborn baby"; (2) "[r]emove a dead unborn baby caused by spontaneous abortion or intrauterine fetal demise"; (3) "[t]reat a woman for an ectopic pregnancy"; or (4) "[t]reat a woman for cancer or another disease that requires medical treatment which treatment may be fatal or harmful to the unborn baby." Wyo. Stat. Ann. § 35-6-122(a)(i)(A)–(D). The Life Act also provides exceptions to the prohibition on abortion (1) "to prevent the death of the pregnant woman [or] a substantial risk of death for the pregnant woman because of a physical condition or the serious and permanent impairment of a life-sustaining organ of a pregnant woman," provided that the physician first "makes all reasonable medical efforts under the circumstances to preserve both the life of the pregnant woman and the life of the unborn baby in a manner consistent with reasonable medical judgment"; (2) when the provision of medical treatment to a pregnant woman "results in the accidental or unintentional injury to, or the death of, an unborn baby"; (3) when the pregnancy is the result of incest as defined by Wyo. Stat. Ann. § 6-4-402 or sexual assault as defined by Wyo. Stat. Ann. § 6-2-301; and (4) "when in the physician's reasonable medical judgment, there is a substantial likelihood that the unborn baby has a lethal fetal

62

anomaly [as defined by Wyo. Stat. Ann. § 35-6-122(a)(vi)] or the pregnancy is determined to be a molar pregnancy." Wyo. Stat. Ann. § 35-6-124(a)(i)–(iv). The Life Act does not prohibit "the use, sale, prescription or administration of a contraceptive measure, drug, chemical or device" so long as the contraceptive measure "is used, sold, prescribed or administered in accordance with manufacturer instructions and is not used, sold, prescribed or administered with the specific intent to cause or induce an abortion." Wyo. Stat. Ann. § 35-6-124(b).

[¶152] The Chemical Abortion statute makes it a misdemeanor "to prescribe, dispense, distribute, sell or use any drug for the purpose of procuring or performing an abortion on any person" but exempts "[a] woman upon whom a chemical abortion is performed or attempted" from this criminal penalty. Wyo. Stat. Ann. § 35-6-139(a), (c), (d). The prohibition on chemical abortions does not apply to (1) "[t]he sale, use, prescription or administration of any contraceptive agent administered before conception or before pregnancy can be confirmed through conventional medical testing;" (2) "[t]he treatment of a natural miscarriage according to currently accepted medical guidelines;" or (3) "[t]reatment necessary to preserve the woman from an imminent peril that substantially endangers her life or health, according to appropriate medical judgment, or the pregnancy is the result of incest as defined by [Wyo. Stat. Ann. § 6-4-402] or sexual assault as defined by [Wyo. Stat. Ann. § 6-2-301]." Wyo. Stat. Ann. § 35-6-139(b)(i)–(iii).

[¶153] In plain terms, abortion is restricted (and can be prohibited) only in situations where none of the listed exceptions apply—such as elective procedures unrelated to saving the baby's or mother's life, treating serious medical conditions, or addressing pregnancies resulting from incest/sexual assault. The statutes allow abortions to protect the woman's life and health. In other words, the abortion statutes target only elective abortions that do not qualify under a listed exception. This targeted approach is the focus of our analysis—whether the legislature could determine these restrictions on a woman's right to make health care decisions are reasonable and necessary to advance the state's interest in protecting prenatal life at all stages of development.

[¶154] By statute, all licensed practitioners must report abortions performed or prescribed in Wyoming to the state health officer, and the office of vital record services is required to prepare and issue a public report with this information. *See* Wyo. Stat. Ann. §§ 35-6-131 through -132 (formerly Wyo. Stat. Ann. §§ 35-6-107 through -108). The record reveals that 91 abortions were reported in 2020, 103 abortions were reported in 2021, and 200 abortions were reported in 2022. For those three years, all but two abortions were performed at a gestational age of 10 weeks or less. The gestational age of the other two was unknown. Based on this information, the legislature could, in its discretion, determine that the abortion statutes were reasonable and necessary to preserve prenatal life at all stages of development, from conception to birth.

[¶155] The plaintiffs do not dispute that the preservation of prenatal life is a legitimate basis to regulate health care but argue such interest "does not become compelling until after viability." The record reflects there are many differing views on the question of when a fetus achieves viability. When a fetus is entitled to legal protection is quintessentially a policy judgment about the relative weight of competing interests. In our constitutional system, such judgments belong in the first instance to the people's elected representatives, who must answer to the people at the ballot box. The Wyoming Legislature decided prenatal life is entitled to protection from conception, and we are not at liberty to second-guess the wisdom or soundness of that policy judgment. Wyo. Stat. Ann. § 35-6-121(a)(i), (v), (vi); *Starrett v. State*, 2012 WY 133, ¶ 12, 286 P.3d 1033, 1038 (Wyo. 2012) ("[O]ur legislature is the policy-making branch of our state government. . . . Members of this Court are vested with the authority to interpret . . . statute[s]; but we do not possess either the expertise or the prerogative to make policy judgments. Those judgments are entrusted to our state's elected leaders, who can be removed from office on election day if our state's citizens disagree with those policy judgments. It does not fall to the courts to protect the citizens from the consequences of their political choices."). Because strict scrutiny does not apply, the State need not show the abortion statutes are the least restrictive means of furthering a compelling state interest.

[¶156] Next, the plaintiffs advance contradictory critiques of whether the abortion statutes are "reasonable and necessary" to accomplish the legislature's objective of preserving prenatal life at all stages of development. First, they contend the statutes are over-inclusive because they prohibit abortions even when the fetus has no chance of survival due to a lethal fetal anomaly.[22] At the same time, they assert the abortion statutes are under-inclusive in terms of preserving prenatal life as they ban multi-fetal reductions, a procedure used to remove one or more fetuses in a pregnancy involving three or more fetuses to increase the chance that the remaining fetuses will survive. By prohibiting multi-fetal reductions, they claim the abortion statutes reduce rather than promote the preservation of

---

[22] While the plaintiffs recognize the abortion statutes contain an exception for lethal fetal anomalies, they argue the exception is illusory as the exception applies only if there is a "substantial likelihood" that the anomaly will result in the baby's death within "hours" of birth and the evidence showed it is impossible to know whether a fetal anomaly will result in the baby's death within hours of birth, as opposed to a few days or weeks. As a result, they claim there are no fetal anomalies that could result in death after birth that will qualify for the exception. I disagree. The Life Act states it will not be unlawful for a licensed physician to "[p]erform an abortion on a woman when in the physician's reasonable medical judgment, there is a substantial likelihood that the unborn baby has a lethal fetal anomaly . . . ." Wyo. Stat. Ann. § 35-6-124(a)(iv). "'Lethal fetal anomaly' means a fetal condition diagnosed before birth *and if the pregnancy results in a live birth* there is a substantial likelihood of death of the child within hours of the child's birth[.]" Wyo. Stat. Ann. § 35-6-122(a)(vi) (emphasis added). The "substantial likelihood of death of the child within hours of the child's birth" does not apply to all lethal fetal anomalies—only those where the pregnancy will result in a live birth.

prenatal life.[23]  The plaintiffs also maintain the exceptions to the abortion ban to protect the health of the pregnant woman and, in the circumstance when the pregnancy is the result of incest or sexual assault, defeat the notion that the abortion statutes were intended to preserve <u>all</u> prenatal life.

[¶157] Arguably, in its effort to preserve prenatal life at all stages of development, the State could have attempted to prohibit all abortions and had it done so argued such prohibition was "necessary."  Article 1, section 38 requires restrictions on the right to make health care decisions to be not only "necessary" but "reasonable."  In the abortion statutes, the legislature allowed exceptions on the abortion ban to save the baby's life, to save the mother's life, to treat serious medical conditions, and to address pregnancies resulting from incest/sexual assault.  These exceptions respect a pregnant woman's health care choices while allowing the regulation of non-essential procedures.

[¶158] Perfection is not required under the "reasonable and necessary" standard adopted by the people in article 1, section 38(c).  Even under the more demanding strict-scrutiny framework, a law "need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449, 135 S.Ct. 1656, 1668, 191 L.Ed.2d 570 (2015).  The legislature's judgment to preserve prenatal life from conception, while carving out exceptions it deemed reasonable and necessary (including for lethal fetal anomalies, maternal life/health, and incest/sexual assault), falls well within the discretion the people expressly granted it.  The legislature has implemented statutes that pass constitutional muster by establishing a reasonable and necessary method to achieve the preservation of prenatal life.

[¶159] Because article 1, section 38 allows the legislature to establish "reasonable and necessary" restrictions on the right to make health care decisions to protect the safety and general welfare of the people or to accomplish other purposes of the Wyoming Constitution, and the abortion statutes reflect the legislature's policy choice of preserving prenatal life at all stages of development, but recognize exceptions in a variety of circumstances, they constitute a reasonable and necessary restriction and do not violate article 1, section 38.  I would reverse the decision of the district court.

---

[23] The plaintiffs misread the abortion statutes.  While the statutes define abortion as including multi-fetal reductions when done with knowledge that the termination by those means will reasonably likely cause the death of an unborn baby, they specifically exclude multi-fetal reductions from the definition of abortion if they are done with the intent to save the life or preserve the health of the unborn baby, remove a dead unborn baby caused by spontaneous abortion or intrauterine fetal demise, or treat a woman for an ectopic pregnancy, cancer, or another disease that requires medical treatment which treatment may be fatal or harmful to the unborn baby.  Wyo. Stat. Ann. § 35-6-122(a)(i)(A)–(D).  Multi-fetal reduction procedures are also not prohibited if they fit within the exceptions contained in § 35-6-124(a)(i)–(iv).